J-A24031-16

2016 PA Super 235

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| SHAUN BERKLEY FREEMAN | |
| Appellant | No. 3740 EDA 2015 |

Appeal from the Judgment of Sentence dated September 28, 2015
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0000488-2014

BEFORE:  BOWES, J., OTT, J., and SOLANO, J.

OPINION BY SOLANO, J.:                    **FILED OCTOBER 31, 2016**

Appellant, Shaun Berkley Freeman, appeals from the judgment of sentence imposed after the trial court convicted him of possession with intent to deliver (marijuana), possession of a controlled substance (marijuana), and possession of drug paraphernalia.[1]  Appellant claims the trial court erred in denying his motion to suppress evidence obtained as a result of a vehicle stop.  After careful review, we affirm.

The trial court recounted the factual background as follows:

On February 25, 2014, [Appellant] was stopped by Pennsylvania State Police Trooper Jonathan Gerken ("Trooper Gerken") on Interstate Route 80 ("I80").  Trooper Gerken was in full uniform on roving patrol in an unmarked vehicle.  He observed a white Chevrolet Malibu traveling westbound on I80 in the right lane following a FedEx truck.  Trooper Gerken stated

---

[1] 35 P.S. §§ 780-113(a)(30), (16), and (32).

that the Malibu was traveling too closely . . . and then the Malibu made several unsafe lane changes. He then initiated a traffic stop of [Appellant's] vehicle on Interstate Route 380 ("I380"). Upon approaching the vehicle, Trooper Gerken noticed an overwhelming odor of air fresheners coming from the vehicle. Trooper Gerken then questioned [Appellant] on his travels and he noticed that [Appellant] was acting nervous and somewhat short in his responses.

After running a CLEAN/NCIC check,[2] Trooper Gerken determined that [Appellant] had a valid license. However, a criminal background check indicated that [Appellant] had a 2005 arrest for a weapon out of New York. Trooper Gerken obtained a copy of the rental car agreement ("agreement") which was a one-day rental from Hertz, New Rochelle, New York. The agreement required the vehicle to be returned to the same location on February 26, 2014 at 8 a.m. Trooper Gerken questioned [Appellant] further about his travel plans and [Appellant] changed his statement. Trooper Gerken then contacted his dispatcher for backup. Trooper Lindsay was dispatched and he arrived on scene a few minutes later. After [Appellant] denied a request to search the vehicle, Trooper Gerken requested a K9 unit to perform an exterior search of the vehicle due to suspicion of criminal activity. Trooper Doblovasky and his K9, Micho, performed a perimeter search, at which time Micho indicated on the vehicle. [Appellant] was then transported back [to] the police barracks and an application for search warrant was made. After the search warrant was issued, [Appellant's] vehicle was searched and 80 pounds of marijuana was discovered along with other paraphernalia. [Appellant] was charged with [the three aforesaid drug offenses]. On April 21, 2014, [Appellant] filed [an] Omnibus Pretrial Motion [seeking suppression]. On January 12, 2015, [the trial court] held a hearing[.]

Trial Court Opinion, 4/2/15, at 1-2.

---

[2] CLEAN is the Commonwealth Law Enforcement Assistance Network. NCIC is the FBI's National Crime Information Center.

On April 1, 2015, the trial court denied Appellant's suppression motion. The case proceeded to trial on August 4, 2015, at the conclusion of which the trial court rendered its guilty verdicts. On September 28, 2015, the trial court sentenced Appellant to 12 months less a day to 24 months less a day, with three years of probation, for possession with intent to deliver. The possession charge merged with the charge for possession with intent to deliver, such that no sentence was imposed for that conviction. With respect to possession of drug paraphernalia, the court imposed a sentence of one year of probation, to run concurrently with the three years of probation imposed for possession with intent to deliver.

Appellant filed a post-sentence motion October 6, 2015, which the trial court denied on November 23, 2015. Appellant filed this timely appeal on December 7, 2015.[3]

On appeal, Appellant presents two issues for our review.

1. Has the Commonwealth carried its burden of proof at a suppression hearing where a defendant alleges that the vehicle stop was unlawfully made in violation of his rights under the Fourth Amendment and Article I Section 8 of the Pennsylvania Constitution, and the trooper offers conclusory testimony that a defendant's vehicle was following too closely for conditions and made unsafe lane changes?

2. Should a canine sniff of a vehicle be suppressed when a defendant and his vehicle are forced to await the arrival of

_____

[3] Appellant's appeal is timely because it was filed within 30 days of the trial court's denial of his timely post-sentence motion. Pa.R.Crim.P. 720(A)(2)(a).

the canine unit while standing alongside an Interstate for over an hour in the February cold without a jacket and without reasonable suspicion or probable cause to suspect a crime had been committed, all in violation of a defendant's rights under the Fourth Amendment and Article I Section 8 of the Pennsylvania Constitution?

Appellant's Brief at 6.

Preliminarily, we reference our standard of review:

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress.

*Commonwealth v. Ranson*, 103 A.3d 73, 76 (Pa. Super. 2014) (internal citations and quotations omitted).

We further note:

It is well-established that there are three categories of interaction between citizens and police officers. As our Supreme Court has clearly articulated:

The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to

respond. The second, an "investigative detention[,]" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Ranson*, 103 A.3d at 76–77.

## The Vehicle Stop

In his first issue, Appellant argues that the initial stop of his vehicle was unlawful. Appellant asserts that Trooper Gerken lacked "probable cause or reasonable suspicion" to initiate the traffic stop and assails Trooper Gerken's testimony. Appellant's Brief at 15, 19-20. In doing so, Appellant claims Trooper Gerken "testified in a conclusory manner about his observations" and without "specific articulable facts." *Id.* at 15.

Trooper Gerken had to have probable cause to initiate the traffic stop. We have explained:

Mere reasonable suspicion will not justify a vehicle stop when the driver's detention cannot serve an investigatory purpose relevant to the suspected violation. In such an instance, "it is encumbent [*sic*] upon the officer to articulate specific facts possessed by him, at the time of the questioned stop, *which would provide probable cause to believe that the vehicle or the driver was in violation of some provision of the Code.*" [**Commonwealth v.**] **Gleason**, 785 A.2d [983,] 989 [Pa. 2001] (citation omitted). **See also [Commonwealth v.] Chase**, 960 A.2d [108,] 116 [Pa. 2008] (reaffirming **Gleason's** probable cause standard for non-investigative detentions of suspected Vehicle Code violations).

*Commonwealth v. Feczko*, 10 A.3d 1285, 1291 (Pa. Super. 2010) (*en banc*) (emphasis in original).

- 5 -

Here, Trooper Gerken testified that he was on patrol on February 25, 2014, when he observed Appellant, who was driving a Chevrolet Malibu in "moderate to heavy traffic," violate the Motor Vehicle Code when he made "several unsafe lane changes, [and] cut across the lanes of traffic." N.T., 1/12/15, at 9-10. Trooper Gerken continued, "[t]he vehicle began following another vehicle entirely too close, due to the weather conditions. I believe it began to follow a tractor-trailer at a distance too close as well, made a change to pass the tractor-trailer, and then cut across the lanes to exit onto 380 northbound." *Id.* at 12. Based on these observations, Trooper Gerken effectuated the traffic stop. *Id.* at 13.

The suppression court credited Trooper Gerken's testimony and explained:

> Trooper Gerken testified that he stopped [Appellant's] vehicle for following too closely and unsafe lane changes. 75 Pa.C.S. § 3310 states that the "driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." Upon observing [Appellant's] vehicle follow the FedEx truck too closely, Trooper Gerken also observed [Appellant's] vehicle make several unsafe lane changes. Based upon this testimony, we find that Trooper Gerken articulated specific probable cause to stop [Appellant's] vehicle.

Trial Court Opinion, 4/2/15, at 3 (citations to notes of testimony omitted).

We have reviewed the notes of testimony, as well as the motor vehicle recording (MVR) that was made from a video camera in Officer Gerken's vehicle and was entered into evidence by the Commonwealth as Exhibit 1.

We note that Appellant claims that "on the MVR . . . it is impossible to have observed the distance at which [Appellant's] vehicle was following any other vehicle." Appellant's Brief at 19.[4] However, our review of the MVR confirms Trooper Gerken's testimony that Appellant made several unsafe lane changes.[5] In particular, the MVR shows Appellant driving close to a tractor trailer to change lanes while passing a Vision tanker truck. This conduct was sufficient to support a finding that Trooper Gerken had probable cause to initiate the traffic stop. ***Commonwealth v. Cook***, 865 A.2d 869 (Pa. Super. 2004) (whether a law enforcement officer possesses probable cause to stop a vehicle for violating the statute governing driving on roadways laned for traffic depends largely upon on whether a driver's movement from his lane is done safely).

Based on the foregoing, our review supports the trial court's determination that Trooper Gerken possessed probable cause to initiate the

_____

[4] Appellant also claims that "Trooper Gerken's testimony regarding weather conditions and snowy roadways is in conflict with the condition of the roads shown on the MVR." Appellant's Brief at 19. In fact, the MVR clearly shows snow on the shoulder of the road, although not on the surface, and it shows that a light snow was falling.

[5] 75 Pa.C.S. § 3309(1) provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety."

vehicle stop based upon Appellant's violation of the Motor Vehicle Code. Accordingly, we find no merit to Appellant's first issue.

**The Investigatory Detention**

In his next issue, Appellant argues that, "after the vehicle stop," he was subject to an unlawful search and seizure "when he and his vehicle were held on the side of the Interstate for over an hour in the February cold." Appellant's Brief at 15, 21; *see id.* at 22-27. In reviewing Appellant's claim that he was unlawfully detained, we scrutinize the record, mindful of the Supreme Court's directive when presented with a defendant who has been seized by a police officer pursuant to a valid traffic stop:

> A police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. *Commonwealth v. Cook*, 558 Pa. 50, 735 A.2d 673, 676 (1999). "This standard, less stringent than probable cause, is commonly known as reasonable suspicion." *Id.* In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. *In re D.M.*, 566 Pa. 445, 781 A.2d 1161, 1163 (2001). In making this determination, we must give "due weight ... to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience." *Cook*, 735 A.2d at 676 (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, "[e]ven a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Cook*, 735 A.2d at 676.

*Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004).

Trooper Gerken testified that when he initiated the traffic stop and first approached Appellant, he "advised him to pull the vehicle further up the road because of the location we had stopped wasn't a safe location with the snow-covered roads." N.T., 1/12/15, at 13-14. Trooper Gerken also advised Appellant "of the violation," and Appellant responded that he "was messing with his vehicle." *Id.* at 14. Trooper Gerken testified that when he approached Appellant again after Appellant moved his vehicle, Trooper Gerken "smelled the overwhelming odor of air fresheners coming from the vehicle." *Id.* at 14-15. On direct examination, the Commonwealth asked the trooper whether he smelled the air fresheners "on the first approach or the second approach." *Id.* at 15. Trooper Gerken stated "I smelled it on both approaches to the vehicle." *Id.*

Trooper Gerken testified that he determined Appellant was driving a rental car and asked Appellant where he was going, and Appellant, who "was somewhat short and nervous in his responses," said he was going to Binghamton, New York. N.T., 1/12/15, at 15. Trooper Gerken then returned to his patrol vehicle, ran a check on Appellant, and determined that he had a valid license, although he also "had a 2005 arrest for a weapon out of New York." *Id.* at 16. Trooper Gerken obtained a copy of Appellant's car rental agreement and noted that it was "a one-day rental . . . February 25 it was rented out of New Rochelle, and it was due back at the same location on the 26th at 8 a.m." *Id.* at 17-18. Trooper Gerken testified that when he

returned to Appellant's vehicle, he "spoke to [Appellant] about the purpose of his trip." *Id.* at 18. Appellant told Trooper Gerken that he was going to visit his cousin in Binghamton. *Id.* Appellant also stated he was on vacation and was returning that night. *Id.* at 19. Trooper Gerken testified that Appellant "changed his statement saying that he – he originally stated that he had to come back for work, and then that changed further on. . . . It changed that he may stay over in Binghamton." *Id.* at 19, 46.[6]

Based on the foregoing, Trooper Gerken explained that he "believed that criminal activity was occurring at that point, so [he] requested [a backup officer]." N.T., 1/12/15, at 20. The trooper stated that his belief was "based on the totality of the circumstances," and he asked for backup "several minutes into the stop, after speaking with [Appellant]." *Id.* Trooper Gerken explained his suspicion of Appellant's criminal activity as follows:

> Typically, in my training and experience, the overwhelming smell of air fresheners in a rental vehicle is consistent with trying to mask the odor of controlled substances. . . . As a trooper, [I have been involved in drug stops with air fresheners,] probably 100 or so. I would have – over the 12 years that I've been a

_____

[6] In advancing his argument that he was improperly detained, Appellant explains his account of whether he would spend the night in Binghamton as speculative and prospective, claiming that he did intend to return home that day but adding that he might change his mind and spend the night if he decided to drink and it became unsafe for him to drive. N.T., 1/12/15, at 43; *see also* Appellant's Brief at 12, citing the MVR. Neither Trooper Gerken nor the trial court were required to credit this explanation, however.

police officer, several hundred traffic stops involving controlled substances.

[Other indicators were the] prior conviction for the weapons offense out of 2005, out of New York; his nervous behavior while I was speaking to him; he was coming from a source area, New York is a source area for controlled substances, as well as Binghamton being a destination area for the delivery of controlled substances. . . . Based on my training and experience, I know in prior arrests that I've had, as well as other troopers, other police officers, that New York City is a hub for controlled substances.

\* \* \*

[Also, t]he short turn-around trip. The vehicle was due back the next morning. The conflicting statements as to the purpose of his trip, that he was staying, that he wasn't. He stated that he was on vacation. He stated that he had to work the next day. . . . He was somewhat shaky when he was presenting his documents to me. There's a difference between the normal police interaction where somebody is nervous because they're stopped by the police and they're afraid to get a ticket.

*Id.* at 22-24.

Trooper Gerken testified that he called a K9 Unit to respond to the scene for a canine search of the car. N.T., 1/12/15, at 25. In referencing his written incident report, Trooper Gerken noted that he initiated the stop of Appellant at 11:26 a.m. and contacted the K9 Unit at 11:52 a.m., so that 26 minutes had elapsed from when Trooper Gerken first stopped Appellant for a Vehicle Code violation to when he called for the K9 Unit. *Id.* at 26. Trooper Gerken testified that by 11:52 a.m., he had "already issued [Appellant] a written warning [for improper lane movement and careless driving] at that

point." **Id.** Trooper Gerken issued the written warning to Appellant before calling for the K9 Unit. **Id.**

Trooper Gerken stated that after he issued the written warning to Appellant, he "stated that [he] wanted to speak to him further. [Appellant] attempted to walk away, at that point and return to the vehicle." N.T., 1/12/15, at 27. Trooper Gerken did not dispute that Appellant "was not free to go at that point." **Id.** at 38, 39. The trooper "asked him what he had been arrested for before, he said DUI; he made no statement as to the weapons offense out of 2005." **Id.** Trooper Gerken testified:

> He started becoming agitated. I asked him if he was coming back or he was going to stay there. He changed again and said he might stay overnight. And I advised him that I'd be contacting, based on all the indicators present, and the reasonable suspicion that existed, I advised him that I'd be contacting a K9.

**Id.** at 27.

Trooper Gerken clarified that he called for the K9 Unit because he had asked Appellant for permission to search the vehicle, and Appellant denied permission. N.T., 1/12/15, at 29. He stated that he calls for a K9 when "there's a stop similar to this where there's refusal to search and reasonable suspicion has been developed." **Id.** at 30. Trooper Gerken stated that when the K9 arrived and was "deployed," the dog "alerted and/or indicated on the vehicle." **Id.** at 31. Trooper Gerken testified, "at that point, [Appellant] was detained and an application was made for a search warrant. . . . [Appellant] was transported to [police] barracks and [the vehicle] was towed [to the

barracks] pending the application for the search warrant." *Id.* at 31-32. Trooper Gerken stated that "around an hour, hour and fifteen" elapsed from the time he initiated the traffic stop of Appellant until he detained Appellant in his patrol car and transported him to police barracks. *Id.* at 36-37. After the search warrant was approved, Trooper Gerken searched Appellant's vehicle. *Id.* at 32. Based on the search, Appellant was charged with the aforementioned drug offenses. *Id.* at 36.

State Trooper Paul Lindsay testified next for the Commonwealth. Trooper Lindsay stated that he responded to Trooper Gerken's request for assistance. N.T., 1/12/15, at 57. Trooper Lindsay also noticed Appellant's rental vehicle because "it was the wintertime, and rental vehicles jump out at you real quick, especially in the wintertime because rental vehicles are very clean. They don't send out dirty cars, where in the wintertime you see a lot of people have a lot of dirt on them and whatnot. This particular vehicle was very shiny. It was very clean." *Id.* at 59-60. Trooper Lindsay stated that he was there "after the K9 was deployed." *Id.* at 60. He admitted to telling Appellant: "that vehicle's loaded with marijuana." *Id.* at 61. Trooper Lindsay testified about the basis for his statement as follows:

> It was mainly based on training and experience. I worked Interstate 81 in the Gibson area, and I was very familiar with the Upstate traffic headed to Binghamton, Elmira, Johnson City, Syracuse, Rochester. Knowing rental vehicles are commonly used by drug traffickers to transport illegal narcotics and the amount of time in which the vehicle was rented and where it was headed to and after a K9 alert, based on my training and experience, I came right out and said, "I believe that vehicle is loaded with marijuana."

*Id.*

Corporal Anthony Doblovasky testified to being the K9 handler who responded to the call for a canine during the stop of Appellant. N.T., 1/12/15, at 64. Corporal Doblovasky explained his role as a K9 handler:

> That day for me to respond there I need to agree with [Trooper Gerken] that he has reasonable suspicion or I'm not going to respond.
>
> If I'm on duty, I might come to the stop and talk to [the trooper] at the stop and see what he has. I've had instances in the past where I didn't agree and I wouldn't run the dog. This case I did agree with the trooper and I did.

*Id.* at 68. Corporal Doblovasky repeated, "my own opinion was there was reasonable suspicion present. . . ." *Id.* at 73.

The Commonwealth's final witness, Corporal Nicholas Cortes, was presented and qualified as an expert in drug identification, interdiction, and trafficking. N.T., 1/12/15, at 84-87. Corporal Cortes testified that rental vehicles are "really common within criminal interdiction and people who are moving, drug traffickers" because they are not subject to forfeiture; rented vehicles are "really reliable" and will not break down; and, because the rental vehicles do not belong to the occupants, the occupants have the excuse that "I didn't know it was there. It's not mine. It's not my car." *Id.* at 88-89. Corporal Cortes also noted that erratic driving was often exhibited by drug traffickers because "someone is either unfamiliar with the route [they are driving] or they're focused on the police officer that's behind them. So a lot of times you'll see them looking in their rearview mirror, and

because they looked in their rearview mirror, they just drove off the road." *Id.* at 90. Corporal Cortes additionally addressed the use of air fresheners as "masking agents" to cover the smell of drugs, observing that "it's not common that we find air fresheners within rental vehicles." *Id.* at 91. In addition, Corporal Cortes opined that New York to Binghamton is "a very common route" where he "personally ha[s] had numerous seizures traveling from New York to Binghamton, two alone in the top 10 seizures." *Id.*

Corporal Cortes summarized:

> My role in this investigation is very limited. I was not on the stop. I did not assist in the investigation at all.
>
> Outside of – I'm Trooper Gerken's supervisor, so I do see his reports come through the office that I have to take into account as an administrator, so that would be my only role in this investigation is whenever he has to update his report with whatever – I mean, wherever the case is at, the status of the case.
>
> ***
>
> [But with regard to reasonable suspicion,] any indicator in and of itself may not be anything. But you take the totality of the circumstances. You put all these indicators together. It's like pieces of a puzzle. You take all the pieces of a puzzle. You put it together. You draw a conclusion from the totality of the circumstances. So you have all these indicators that are piled up together, and that's where you're drawing your conclusion. You're not just basing it on one thing.

N.T., 1/12/15, at 94, 102.

The trial court credited the testimony of the Commonwealth's witnesses and distilled their testimony as follows:

Instantly, Trooper Gerken observed several indicators of drug-related activity during the course of the traffic stop. First, he smelled the overwhelming odor of air freshener coming from inside of the vehicle. After running a check on [Appellant's] license, Trooper Gerken discovered that [Appellant] had a conviction[7] for [a] weapons offense in New York. [Appellant] indicated that he was traveling from New York to Binghamton, which in Trooper Gerken's training and experience indicates a source area and a destination for delivery of controlled substances. The rental car agreement was for 24 hours. In addition, [Appellant] was "somewhat shaky" in his demeanor. Based upon these observations, we find that Trooper Gerken had reasonable suspicion to suspect illegal activity to justify the investigative detention and canine sniff. Moreover, the search warrant was based upon the canine search of the exterior of the vehicle where [the canine] indicat[ed] on the vehicle's trunk. Marijuana was later discovered in the vehicle's trunk as a result of the search warrant issued. As such, we find that the search was lawful . . ..

Trial Court Opinion, 4/2/15, at 5 (citations to notes of testimony omitted).

After careful consideration, we agree with the trial court's decision.

We recognize that, when viewed in isolation, many of the facts on which the troopers relied appear innocuous. We would hesitate to hold that a vehicle may be detained for more than an hour and subjected to a canine search merely because it had been rented for a one-way trip from New York to Binghamton, a purported drug destination, or because the driver, when stopped, appeared agitated. But we are required to review the circumstances in their totality, and, upon doing so, we conclude that the

---

[7] Appellant correctly points out that this statement in the trial court's opinion is erroneous. Appellant's Brief at 26. Appellant's criminal history indicated an **arrest** for a firearms offense, not a **conviction.** *See* N.T., 1/12/15, at 16.

evidence was sufficient to support the trial court's determination that the troopers' detention of Appellant was supported by reasonable suspicion. Pennsylvania case precedents addressing similar facts support our conclusion.

In **Commonwealth v. Kemp**, 961 A.2d 1247 (Pa. Super. 2008) (*en banc*), a state trooper monitoring traffic along the Pennsylvania Turnpike observed a vehicle with tinted windows in violation of 75 Pa.C.S. § 4524(e)(1), which gave him probable cause to initiate a valid vehicle stop. 961 A.2d at 1250-1251. During the stop, the trooper suspected illegal drug activity, based on his extensive training and experience in drug trafficking interdictions, his observation of a large number of air fresheners in the vehicle, the extreme nervousness of the appellant's companion, the fact that the appellant and the companion were operating a third-party vehicle ("another marker of a drug courier"), the appellant's failure to provide the name of the vehicle's real owner, and the odor of raw marijuana. *Id.* at 1254. The appellant challenged the trial court's denial of his suppression motion and claimed on appeal that, "even though the initial traffic stop in this case may have been proper, the prolonged seizure after the Sergeant had achieved the purpose of the vehicle stop required reasonable suspicion to support the continuation of the stop and questioning of Appellant," and such a reasonable suspicion was lacking. *Id*. at 1252.

We concluded that "the facts adduced by [the state trooper] during the course of the valid traffic stop clearly and unequivocally gave him reason to

suspect that [a]ppellant and [his companion] were in possession of a controlled substance, and thus, there were sufficient facts to justify the investigatory detention." **Kemp**, 961 A.2d at 1254. In doing so, we emphasized:

> "When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." **United States v. Arvizu**, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); **accord Rogers, supra; [Commonwealth v.] Freeman,** [757 A.2d 903, 908 (Pa. 2000)]. A totality-of-the-circumstances approach allows the court to consider all facts at the officer's disposal and does not require the court to disregard those adduced during a valid interdiction, which is, in the present case, the traffic stop. Indeed, routine constitutional analysis requires courts to utilize facts gathered during each escalating phase of a police investigation in determining whether police acted properly as the interaction between police and citizen proceeded towards an arrest.

*Id.* at 1258-59.

In a later decision dealing with a vehicle stop, this Court extrapolated from **Rogers** and **Kemp** as follows:

> Based upon **Rogers** and **Kemp**, we conclude that Trooper Jones adduced sufficient facts to establish reasonable suspicion that criminal activity was afoot in this case. The car was owned by a third party not present in the vehicle, [the driver] acted nervously, the answers provided by [the driver] and [the appellant] to basic questions regarding their destination were inconsistent, and various masking agents, including air fresheners, canisters of perfume, and a bottle of Fabreze, were present in the vehicle. When considering the totality of the circumstances, we need not limit our inquiry to only those facts that clearly and unmistakably indicate criminal conduct. [**Kemp**.] Instead, "even a combination of innocent facts, when

taken together, may warrant further investigation by the police officer." *Id.* (quoting [*Commonwealth v. Cook*, 735 A.2d at 676]).

*Commonwealth v. Caban*, 60 A.3d 120, 129 (Pa. Super. 2012).

Most recently, we addressed facts very similar to those in this case in *Commonwealth v. Valdivia*, --- A.3d ----, 2016 WL 4413224, (Pa. Super., Aug. 19, 2016). The state troopers in *Valdivia* were patrolling Interstate 80 when they observed a vehicle violate the Vehicle Code by quickly changing lanes without using a turn signal. 2016 WL 4413224 at *2. They initiated a traffic stop based on probable cause. *Id.* We related the ensuing encounter as follows:

> As Trooper Hoy approached the vehicle, he noticed two large boxes wrapped in Christmas paper and a suitcase in the cargo area of the vehicle. Trooper Hoy testified that drug smugglers often wrap drugs in Christmas paper around the holidays in an effort to blend in with innocent motorists.
>
> Trooper Hoy asked the driver (Valdivia) for his license, registration, and proof of insurance. Valdivia gave Trooper Hoy a license and rental agreement and stated that the vehicle was a rental. As Valdivia produced the documents, the trooper noticed that Valdivia's hands were shaking, and that he seemed nervous. Valdivia stated that he needed to pull off and get gas. Trooper Hoy found this strange because gas had been available at two exits that Valdivia had just passed.
>
> Trooper Hoy asked Valdivia about his travel plans. Valdivia responded that he was flying from Fort Lauderdale, Florida to New Jersey, but his flight had been re-routed to Detroit, Michigan, and he had to rent a vehicle because he had missed his connecting flight to New Jersey. Trooper Hoy found it strange that the packages in the cargo area were unblemished, even though they presumably had been part of Valdivia's belongings on his flight from Florida. Trooper

- 19 -

Hoy noticed from the vehicle information that Valdivia rented the car in Ann Arbor, Michigan, not Detroit, Michigan as he had stated, and that the rental was for a one-way trip. Trooper Hoy knew from his training and experience that the route Valdivia was traveling, Michigan to New Jersey, is a common drug trafficking route.

Trooper Hoy then went back to his patrol cruiser and ran a records check, as is his custom, while completing the warning paperwork for the illegal lane change. Trooper Hoy also contacted a State Police K-9 Unit to respond to the scene. The record check revealed that Valdivia had been previously charged in Florida with possession with intent to deliver.

Trooper Hoy returned to Valdivia's vehicle, asked him to exit the vehicle, explained the warning, and returned Valdivia's identification documents. Trooper Hoy then inquired if he could ask some follow-up questions about Valdivia's travel plans. Valdivia changed his story when answering these additional questions. He now stated that he had flown to Detroit to visit a friend and had left early the next morning. He also said that when he arrived at the Detroit airport, all of the rental companies were closed, which was why he rented the vehicle in Ann Arbor. Trooper Hoy felt that Valdivia's responses were unusual, because one does not normally visit a friend for such a short time, most of which would be spent sleeping. Trooper Hoy also found it difficult to believe that all rental companies would have been closed at a large airport such as Detroit.

*Id.* at **2-3 (citations to notes of testimony and footnote omitted). After considering the above facts in conjunction with applicable case law, we stated that "Trooper Hoy observed a variety of suspicious details during the traffic stop." *Id.* at *4. We then concluded that this "combination of factors provided reasonable suspicion to detain Valdivia and continue an investigation into possible criminal wrongdoing." *Id.* *Valdivia* illustrates how individual facts that may not be suspicious when viewed alone, or by a

layperson unfamiliar with drug trafficking, may coalesce to form reasonable suspicion.

Guided by the above precedents, we conclude that the trial court did not err in determining that all of the circumstances in this case — in their totality — supported Trooper Gerken's "***suspicion*** of criminal conduct that is reasonable based upon the facts of the matter." Trial Court Opinion, 4/2/15, at 5 (emphasis in original). While this may appear to be a close case, we discern no basis to disturb the trial court's denial of Appellant's suppression motion.

Finally, we are not persuaded by Appellant's argument that the duration of the detention and the weather during the detention should change our conclusion. It is uncontroverted that Appellant was detained for a significant period of time — more than one hour. ***See*** Appellant's Brief at 28; N.T., 1/12/15, at 36-37. Trooper Gerken testified that the "length of the entire traffic stop, from the point upon which [he] pulled [Appellant] over, until the point upon which [he] detained him in the car to transport him to the barracks" was "somewhere around an hour, hour and fifteen [minutes]." ***Id.*** Trooper Gerken initiated the stop at 11:26 a.m., and he "contacted Trooper Conrad, originally, to respond to the scene" at 11:52 a.m. ***Id.*** at 25-26. However, Trooper Conrad advised Trooper Gerken that he was unavailable, and Trooper Doblovasky "would be the one responding." ***Id.*** at 26. Trooper Gerken stated that "it was a little bit of time for [Trooper

Doblovasky] to respond to that — the location." ***Id.*** at 37.  Trooper

Doblovasky testified that when he arrived at the scene, "once I got the dog

to the vehicle and we started our search, it was less than a minute and we

were done, seconds.  It's that quick." ***Id.*** at 77.

The United States Supreme Court has explained:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.  ***See Michigan v. Summers***, [452 U.S. 692, 701 n.14 (1981)] (quoting 3 W. LaFave, Search and Seizure § 9.2, p. 40 (1978));  ***see also*** [***U.S. v. Place***, 462 U.S. 696, 709 (1983)]; [***Florida v. Royer***, 460 U.S. 491, 500 (1983)].  A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.  . . . . A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.  But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable." ***Cady v. Dombrowski,*** 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973); see also ***United States v. Martinez-Fuerte***, 428 U.S. 543, 557, n. 12, 96 S.Ct. 3074, 3082, n. 12, 49 L.Ed.2d 1116 (1976).  The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

***United States v. Sharpe***, 470 U.S. 675, 686-687 (1985).

The Pennsylvania Supreme Court, relying on ***Sharpe***, held that an

officer's detention of an appellant was "no more than an investigative

detention supported by reasonable suspicion [where the a]ppellant was

detained for approximately ten to fifteen minutes in order to allow [another officer] to view the crime scene and transport the witness[.]" The Court stated, "These actions were reasonable attempts to confirm or dispel the officer's suspicions and were diligently pursued." *Commonwealth v. Ellis*, 662 A.2d 1043, 1049 (Pa. 1995).

The detention at issue here certainly was much longer than that before the Court in *Ellis*. Nevertheless, the record before us shows that, under the circumstances, the troopers acted reasonably and diligently in pursuing their suspicions during the one-hour-plus time frame. The vehicle was stopped in a rural area of the Commonwealth. In the first half hour after the stop, Trooper Gerken had Appellant move his car to a safer location and then questioned Appellant and notified him of the traffic violation. Trooper Gerken then called for backup and a canine unit. Once the dog arrived, the search was conducted quickly. There is no evidence that the detention was delayed for any improper reason. It stands to reason that dispatching a canine unit to a rural location will likely take longer than doing so in an urban area. We therefore hold that the duration of the detention was not unreasonable.

With regard to the weather, we note that Appellant repeatedly references the winter cold and that he waited outside "without a jacket." Appellant's Brief at 15, 21, 28, 30, 32. He asserts that his "seizure . . . on the side of the Interstate in the February cold without a jacket for over an

hour was unreasonable . . . and should be considered a *de facto* arrest; therefore probable cause should have been required." *Id.* at 28. Trooper Gerken testified, however, that he did not "believe it was below freezing" when he detained Appellant, and he offered uncontroverted testimony that repeated offers were made to provide Appellant with his jacket and to permit him to sit in the back of the heated patrol vehicle — offers that Appellant declined. N.T., 1/12/15, at 40. Trooper Gerken also testified that he honored Appellant's request to retrieve his scarf for him from the vehicle. *Id.* at 45-46. Our review of the MVR confirms this testimony. Accordingly, we do not believe the cold weather is germane to our analysis of the propriety of Appellant's detention.

In sum, given our extensive review of the record, we conclude that the trial court did not err in determining that the initial vehicle stop was justified by probable cause and was followed by an investigative detention that was supported by reasonable suspicion. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/31/2016