J-A14040-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JOHNNIE MADDOX, | |
| Appellant | No. 1848 EDA 2015 |

Appeal from the Judgment of Sentence May 26, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0004589-2012

BEFORE: BENDER, P.J.E., BOWES and SHOGAN, JJ.

MEMORANDUM BY SHOGAN, J.:                              **FILED JULY 25, 2017**

Johnnie Maddox ("Appellant") appeals from the judgment of sentence entered on May 26, 2015, that made final the May 5, 2014 order denying his motion to suppress. We affirm.

The record reveals that on March 28, 2012, at 8:48 p.m., Police Officer Jason Hernandez of the Philadelphia Police Department and his partner Police Officer Karl Diaz received a radio call ("flash") regarding a man with a gun roughly five blocks from their position. N.T., 5/5/14, at 7-11. The flash described the man as an approximately fifty-year-old black male wearing a red Philadelphia Phillies baseball cap, a beige jacket, and dark pants. *Id*. at 12. In patrolling the area around the described location, the officers observed Appellant, who closely matched the flash description, approximately a block and one-half away, on the 500 block of West Cornwall

Street. *Id*. at 13, 21. Officer Hernandez testified that less than five minutes elapsed between the flash and their observation of Appellant. *Id*. at 23. As the officers approached Appellant in a marked patrol car, they observed him alter his course away from them and attempt to gain entry into a house on the 500 block, but the door was locked. *Id*. at 14. This house was later determined to be the home of one of Appellant's relatives. *Id*. At this point, the officers stepped out of their patrol car and told Appellant to stop moving and to show his hands. *Id*. Officer Hernandez believed that Officer Diaz had his gun drawn when they exited the car. *Id*. at 25 Appellant responded saying, "I didn't do nothing. Leave me alone," but he did not show the officers his hands. *Id*. at 14. Officer Hernandez testified that Appellant was attempting to open the door of the house with one hand and grabbing at his waistband or pocket with the other. *Id*. Again, the officers asked to see Appellant's hands, but he refused and a struggle ensued. *Id*. at 15. After Appellant was handcuffed, he continually tried to reach his hand into his pocket, at some point saying, "Kill me. Just kill me." *Id*. at 18. When attempting to remove Appellant's hand from his pocket, Officer Hernandez felt a gun. *Id*. at 19. A firearm was recovered from Appellant's pants pocket. *Id*.

Appellant was charged with possession of a firearm prohibited, 18 Pa.C.S. § 6105(a)(1), firearms not to be carried without license, 18 Pa.C.S. § 6106(a)(1), and carrying firearms in public in Philadelphia, 18 Pa.C.S.

J-A14040-17

§ 6108.[1]  On June 12, 2012, Appellant filed a motion to suppress that was denied by the trial court on May 5, 2014.  On May 14, 2014, Appellant filed a motion to reconsider, which the trial court denied on July 31, 2014. Appellant proceeded to a bench trial, where he was found guilty of all charges.  Appellant was sentenced to an aggregate term of six to twelve years of incarceration on May 26, 2015.  On June 22, 2015, Appellant filed a timely appeal.  Both the trial court and Appellant have complied with Pa.R.A.P. 1925.

Appellant asserts the following issue on appeal:

Did not the lower court err in denying [Appellant's] motion to suppress evidence where [Appellant] was seized in the absence of reasonable suspicion or probable cause, and where a gun taken from [Appellant's] person derived from that illegal seizure[?]

Appellant's Brief at 3.

We begin with our well-established standard of review for the denial of a suppression motion.

In evaluating a suppression ruling, we consider the evidence of the Commonwealth, as the prevailing party below, and any evidence of the defendant that is uncontradicted when examined in the context of the record. ***Commonwealth v. Sanders***, 42 A.3d 325, 330 (Pa. Super. 2012).  This Court is bound by the factual findings of the suppression court where the record supports those findings and may only reverse when the legal conclusions drawn from those facts are in error. ***Id***.

_____

[1]  Appellant was also charged with resisting arrest, but that charge was *nol prossed*.

- 3 -

*Commonwealth v. Haynes*, 116 A.3d 640, 644 (Pa. Super. 2015). Additionally, this Court only examines the evidence offered at the suppression hearing when reviewing a ruling on a pretrial motion to suppress. *In re L.J.*, 79 A.3d 1073, 1085-1087 (Pa. 2013).

Three levels of interaction between police officers and citizens have been enumerated by our Supreme Court, as follows:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an **"investigative detention" must be supported by a reasonable suspicion**; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Ranson*, 103 A.3d 73, 77 (Pa. Super. 2014) (emphasis added) (quoting *Commonwealth v. Gutierrez*, 36 A.3d 1104, 1107 (Pa. Super. 2012)).

Appellant argues in part that:

> The police did not possess even reasonable suspicion at the time of this seizure because [Appellant] only cursorily matched the description of a person with a gun given by an anonymous tipster, and although [Appellant] was stopped a block-and-a-half away (outside of a family residence) from the reported location, at a time that may or may not have been near to when the anonymous tipster made his observations, the police possessed no facts indicating that [Appellant] had been engaged in criminal activity.

Appellant's Brief at 11. Thus, Appellant contends that the trial court erred in denying his motion to suppress.

- 4 -

Whether law enforcement officers possess the requisite reasonable suspicion that criminal activity is afoot is an objective conclusion that is determined by analyzing the "totality of the circumstances." **Commonwealth v. Freeman**, 150 A.3d 32, 37 (Pa. Super. 2016) (citing **In re D.M.**, 781 A.2d 1161 (Pa. 2001)); **Commonwealth v. Davis**, 102 A.3d 996, 1000 (Pa. Super. 2014). In analyzing the totality of circumstances, this Court must give "due weight . . . to the specific reasonable inferences [the officer] is entitled to draw from the facts in light of his experience." **Freeman**, 150 A.3d at 37 (citing **Commonwealth v. Cook**, 735 A.2d 673, 676 (Pa. 1999)). Moreover, this inquiry is not limited to an examination of only criminal conduct. Rather, "a combination of innocent facts, when taken together, may warrant further investigation by the police officer" in the form of an investigative detention. **Freeman**, 150 A.3d at 37.

In this case, Officer Hernandez testified to the following facts that led him and his partner to exit their patrol car, communicate with Appellant, and eventually detain him:

> Q: Were you working as a police officer in the 25th District back on March 28th of 2012, at around 8:40 p.m. in the evening?
>
> A: Yes, I was.
>
> Q: Did your tour of duty around that time on that date, take you to the area of 525 West Cornwall Street in Philadelphia?
>
> A: Yes, it did.
>
> Q: Officer, were you working by yourself or with a partner on that night?

A: My partner, Police Officer Karl Diaz, Badge No. 2522.

Q: Were you on foot or in a vehicle?

A: In a vehicle with uniform patrol.

* * *

Q: Okay. In the area around West Cornwall Street, are you familiar with that area?

A: Yes.

Q: Have you ever responded to any incidents in that area before?

A: Yes, I have.

Q: How would you describe that area?

A: It's a very violent, high . . . narcotic area with a lot of shootings, robberies, stabbings. A little bit of everything.

Q: And when you say "that area," like how many blocks within Cornwall would you describe as a violent, high narcotic area?

A: All the way from . . . if you begin on 5th Street, from the 3200 block of 5th Street to the 3400 block of 5th Street.

You've got multiple blocks right next to it, 3200 Fairhill, 3200 Randolph, all narcotics.

Cornwall, 500 West Cornwall, a very high narcotic block.

Q: And have you responded to calls for gun violence there before?

A: Yes, I have.

Q: Have you recovered guns from people there before?

A: Myself, no.

Q: Okay. Have you responded to robberies and shootings in that area?

A: Yes.

Q: About how many would you say, over your career?

A: Over ten.

Q: Have you made narcotic arrests in that area?

A: I have.

Q: Okay. About how many?

A: In that area, I would say over 10 to 12 in that area.

Q: Okay. And on that evening, did you receive a radio call[?]

A: Yes, we did.

Q: About what time did you receive that radio call?

A: If I look at my notes, it was approximately 8:48 in the p.m.

Q: And as best you can remember, what was that radio call for?

A: It was in reference to a person with a gun at the corner of 6th and Glenwood Street.

Q: And 6th and Glenwood, how far away is that from 525 West Cornwall?

A: A block or a block and-a-half.

Q: And where were you when you received the call?

* * *

A: I would say approximately maybe 5 blocks. I don't remember exactly where we were at.

* * *

Q: Okay. And was there a description given of that person?

A: Yes, it was.

Q: What is the best you remember of that description?

A: I wrote it down. It was a black male, approximately 50 years old. He had a red Phillies baseball cap. I believe it was a beige jacket or so, and dark pants.

Q: Okay. After receiving that call, what did you do?

A: When we got to the corner of 6th and Glenwood, nobody in [sic] that corner was matching the flash.

Myself, as well as other officers who responded to that job, surveyed the area. We eventually went onto the 500 block of West Cornwall.

\* \* \*

Q: Okay. And when you got there what, if anything, happened?

A: When we got to the 500 block of West Cornwall, we observed [Appellant who is seated] to the left of the defense counsel.

\* \* \*

Q: I'm sorry. Go ahead. You saw him where?

A: He was walking on the street. He crossed the street and attempted to go up the stairs, or he did go up the stairs to -- if I can look at my notes for the exact address -- it was 525 West Cornwall.

Q: Okay. And what are you doing while this is happening?

A: Well, we're still in the patrol car.

Q: Okay.

A: Once he gets on the steps, at that point we stopped the patrol car and we exited our vehicle.

Q: How far away were you from him when he crossed the street and attempted to enter into that property?

A: I would say approximately maybe 30 feet or so.

Q: Okay.  And had you attempted to stop him in any way at that point?

A:  Not until he was on the stairs.  At that point, my partner asked him to stop.

Q: Did you or your partner get out of the vehicle?

A: Yes.  We both got out of the vehicle once he was on the stairs.

Q: Okay.  And what happened then?

A: My partner asked him to stop.  He was trying to – I believe there was an iron door.  He was trying to open it and knock on the door.

One hand we couldn't see, it was around his waist area, around his pants.  He stated, "I didn't do nothing, leave me alone."

* * *

Q: The hand that you couldn't see, what, if anything, was he doing with that?

A: It was right around his pocket area, which I couldn't see. Numerous times we asked him to show his hands.

At this point we weren't sure if he had a weapon on him or not, but for our safety, you know, we needed to see his hands.

Q: So did he show you his hands?

A: Not at all, no.

* * *

Q: You told else [sic] that your radio call was for a person, a black male – was it age 50 or 50's?

A: I said it was approximately 50's.

Q: Approximately 50's, in a red Phillies cap, beige jacket, and dark colored pants; is that correct?

A: Correct.

Q: Based on biographical information, what was [Appellant] wearing at the time you arrested him?

A: He had a red Phillies baseball hat, a gray hoodie, and dark blue jeans.

Q: And did you note his complexion?

A: Complexion medium.

Q: And did you know his ethnic background?

A: Black male.

Q: And what age was he when he was arrested?

A: He was 60 years old.

N.T., 5/5/14, at 7-14, 20-21.

As noted above, Appellant was identified as a suspect because he generally matched the description of the man with a gun in the flash (an approximately 50-year-old man in a beige jacket, a red Philadelphia Phillies cap, and dark pants). N.T., 5/5/14, at 12, 21. Appellant matched the description in approximate age and sex; he was wearing a red Philadelphia Phillies cap, light colored hoodie, and dark pants, *i.e.*, jeans. N.T., 5/5/14, at 12, 21.

It is well settled that reasonable suspicion is not *per se* satisfied when an investigative detention occurs in a high-crime neighborhood. ***Commonwealth v. Kearney***, 601 A.2d 346 (Pa. Super. 1992). However, presence in a high-crime neighborhood should be weighed in the totality of circumstances that may collectively give rise to reasonable suspicion. ***Cook***, 735 A.2d at 558; ***Ranson***, 103 A.3d at 80. Appellant was detained on the 500 block of West Cornwall Street which, as described by Officer Hernandez, was located in a high-crime and high-narcotic neighborhood, thus bolstering the assertion of reasonable suspicion. N.T., 5/5/14, at 9. Moreover, this Court considers the experience of the detaining officers, both in matters of their profession and the events that led up to the detention. ***Commonwealth v. Stilo***, 138 A.3d 32, 39 (Pa. Super. 2016) (citing ***Commonwealth v. Carter***, 105 A.3d 765, 769 (Pa. Super. 2014)). In this case, Officer Hernandez made ten to twelve arrests in the neighborhood surrounding the 500 block of West Cornwall Street during his tenure; thus, Officer Hernandez's assertion of reasonable suspicion was supported by his experience in that area. N.T., 5/5/14, at 9.

This Court also gives considerable weight to the proximity of a detainee to the location described in a flash. ***Commonwealth v. Walls***, 53 A.3d 889, 894 (Pa. Super. 2012) ("The [a]ppellee's proximity to the location described in the flash and [the a]ppellee's matching the description of the suspect, does give rise to reasonable suspicion that criminal activity was

afoot."). Appellant, in this case, was first observed by the detaining officers approximately one and one-half blocks from the street corner identified in the flash. N.T., 5/5/14, at 11. Appellant's proximity to the flash location corresponds to the time it took the officers to arrive at the 500 block of West Cornwall Street after they received the flash. *Id*.

In addition to the aforementioned factors, Appellant also exhibited suspicious, furtive behavior by changing his course and attempting to gain access to a locked house by banging on the door and jiggling the handle at night when the police arrived. N.T., 5/5/14, at 13-15. Appellant asserts that this factor is irrelevant because the house at 525 West Cornwall Street actually belonged to Appellant's relative. Appellant's Brief at 14. However, the presence of nervous or furtive behavior and unprovoked flight in the presence of a police officer are factors in establishing reasonable suspicion. *Commonwealth v. McCoy*, 154 A.3d 813, 819 (Pa. Super. 2017); *Commonwealth v. Washington*, 51 A.3d 895, 898 (Pa. Super. 2012) ("[N]ervous, evasive behavior and headlong flight all provoke suspicion of criminal behavior in the context of response to police presence."). Thus, Appellant's behavior upon seeing the officers and his attempt to gain entry to a locked house at night are additional factors that give rise to reasonable suspicion.

Finally, the officers testified that Appellant refused to show his hands when ordered to and reached for his waistband or pocket. N.T., 5/5/14, at

14. In **Commonwealth v. Scarborough**, 89 A.3d 679 (Pa. Super. 2014), this Court held that a suspect's refusal to show police officers his hands by keeping his hand in his jacket pocket in a high-crime area was sufficient to establish reasonable suspicion. Instantly, Appellant refused to show the officers his hands when they ordered multiple times that he do so; he continued to keep his right hand around his waistband even after he was detained. N.T., 5/5/14 at 15-16. We conclude that Appellant's refusal to show the officers his hands when so ordered is another factor in establishing reasonable suspicion.

As discussed above, this Court must view the totality of the circumstances from which the aforementioned factors arise to determine if reasonable suspicion is present. **Freeman**, 150 A.3d at 32. In the instant case, the detention occurred at night, in a high-crime neighborhood. Appellant closely matched the flash description, he was within close proximity to the location described in the flash, and he engaged in nervous behavior in the presence of law enforcement. Accordingly, we discern no error in the trial court's denial of Appellant's motion to suppress.

Judgment of sentence affirmed.

Judge Bowes joins the Memorandum.

P.J.E. Bender concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/25/2017