J-S10042-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT PENNSYLVANIA |
| Appellee | |
| v. | |
| DANTE LAMA BURTON | |
| Appellant | No. 3688 EDA 2015 |

Appeal from the Judgment of Sentence dated September 15, 2005
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-1100571-2004

BEFORE: BENDER, P.J.E., DUBOW, J., and SOLANO, J.

MEMORANDUM BY SOLANO, J.: **FILED JULY 26, 2017**

Appellant, Dante Lama Burton, appeals the judgment of sentence entered September 15, 2005, after a jury convicted him of murder in the first degree, carrying firearms without a license, and possessing an instrument of crime.[1] We affirm.

In its opinion and order entered May 10, 2007, the trial court fully and correctly set forth the relevant facts of this case:

> On August 28, 2004, just after midnight, [Appellant] was in the basement apartment of his girlfriend, Shawnise Stone, in the Mt. Airy section of Philadelphia. The decedent in this case, Kevin Davis, had a girlfriend, Luchania McCullough, who also lived in the basement apartment and was Ms. Stone's roommate and first cousin.

---

[1] 18 Pa.C.S. §§ 2502, 6106, and 907.

The decedent knocked at the basement door from the backyard area that led into the basement apartment. At that time, Durrell Lloyd was in the apartment visiting Ms. McCullough. She thought that the decedent would be jealous, so she told Mr. Lloyd to leave the basement apartment by going upstairs and leaving out of the house by way of the first floor. Unfortunately, as he was entering the basement apartment, the decedent saw Mr. Lloyd going upstairs and began to question Ms. McCullough as to who had been there to see her.

An argument ensued between the decedent and Ms. McCollough about the situation, and it soon escalated to eventually include Ms. Stone and her mother. In fact, when the decedent went upstairs to look for Mr. Lloyd; he was told by the mother that he had no business wandering around her house. The decedent then began to argue even more heatedly with [Appellant]'s girlfriend. As they continued to curse at each other, she ordered him out of her apartment and the house.

The decedent walked out the back door of the basement apartment and into the backyard. [Appellant] followed him into the backyard, and made comments to the effect that he wanted to make sure that the decedent was "okay." Both Ms. McCullough and another person who lived in the house, Monique Shenoster, testified that they watched [Appellant] walk behind the decedent as the two of them left the backyard and walked into a nearby alley. Ms. Shenoster was watching from a second floor window, and she testified that within seconds after they got out of her view she heard three or four gunshots. She then saw [Appellant] run out of the alley, and heard Ms. McCullough screaming in the backyard.

Ms. McCullough told the jury that after Ms. Stone told the decedent to leave the house, she observed and heard [Appellant] tell him, "I will walk with you." She said that [Appellant] proceeded to walk out behind the decedent and into the backyard. She testified that she went back to her room and could not see either man once they left the basement. However, she stated that she heard "about four" gunshots "maybe two minutes later."

Ms. McCullough ran outside with her cousin, and saw [Appellant] coming out of the alley. She testified that he "looked like he was putting something in his pants" as he walked out of

the alley towards the basement apartment. Once he was in the basement apartment, [Appellant] was doing something in the closet there and said, "Let me get the shells." He then ran outside and was not present when the police and paramedics arrived at the house.

[Appellant] gave a detailed inculpatory statement to the homicide detectives on August 31, 2004. He had already given a statement in which he denied culpability on August 28th, but he returned to the homicide division with his family three days later. He had been calling Detective Aaron Booker to tell him that he was being threatened and did not feel safe. Detective Booker told him to come to the homicide division on the 31st, and that they would discuss the situation.

When [Appellant] arrived at 2:55 a.m., Detective Booker was not there. He did not get to the homicide division until approximately 4:00 a.m. when he conversed with [Appellant] and his family about the threats and his fears. Detective Booker was emphatic in his trial testimony that [Appellant] was never under arrest prior to his making the inculpatory statement, and that he was free to leave at any time up to that point.

Detective Booker left the homicide division at 4:20 a.m. to check out information that [Appellant] had just given him, but [Appellant] and his family stayed. He returned at 9:00 a.m., and eventually confronted [Appellant] with the fact that he did not believe the account that he had given him earlier that day. Sometime after 1:00 p.m. on the 31st, Detective Booker warned [Appellant] of his *Miranda* rights[2] and began to take a formal statement from him. [Appellant] had actually conversed with his family in person and on the phone just prior to his giving the inculpatory statement to Detective Booker.

In his statement, [Appellant] admitted that he followed the decedent out of the basement apartment, but he insisted that his intent was to get him to calm down. He contended in the statement that the decedent began to become angry with him and started to curse at him. He continued in his statement by alleging that the decedent turned around and moved his hand

_____

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

"towards his waist." [Appellant] pulled out his gun and shot the decedent because he "was scared" that he was the one who was about to be shot. He said that he threw the gun into a river near the Philadelphia Zoo, and went home after the shooting to change his clothes. He was arrested at the homicide division shortly after completing and signing the inculpatory statement at 3:00 p.m. on August 31, 2004.

Trial Ct. Op., 5/10/07, at 3-7.

Prior to trial, Appellant filed a motion to suppress inculpatory statements made by him after his arrest. Trial Ct. Op., 5/10/07, at 1. At the suppression hearing, Trial Counsel argued that Appellant's inculpatory statements violated the "six-hour rule" and "that [Appellant] 'was either not fully given his *Miranda* warnings or did not understand his warnings.'" *Id.* at 9 (quoting N.T., 7/25/05, at 3).[3] During the suppression hearing, Detective Booker "was emphatic in his testimony that neither he nor his partner physically or psychologically abused the defendant nor threatened him with any type of abuse." *Id.* at 10-11. On July 26, 2005, the trial court denied Appellant's suppression motion. *Id.* at 1.

The jury trial began on the next day. During the trial, Appellant argued that a mistrial should have been granted when the prosecutor made the following remarks during closing arguments:

---

[3] "The six hour rule require[d] that an arrestee be arraigned within six hours of arrest in recognition of the inherently coercive nature of prolonged custodial interrogation." *Commonwealth v. Bond*, 652 A.2d 308, 312 (Pa. 1995). The six-hour rule had already been abolished by the Supreme Court of Pennsylvania in *Commonwealth v. Perez*, 845 A.2d 779, 786-87 (Pa. Mar. 24, 2004), prior to Appellant's suppression hearing.

> [THE COMMONWEALTH]: Do you think it was reasonable to believe that he had fear of being injured by Kevin Davis after his putting two bullets in back? I have to stand here and respond to all this. That's my job. I don't want you going home and thinking he didn't respond to it. Maybe he agrees with it. There is less than nothing to support sending this young man home. Not guilty, but your reason of self defense is less than nothing. It's an absolute joke that is actually claimed by the defense. . . .

Trial Ct. Op. at 11-12 (quoting notes of testimony). The court called counsel to side bar after this statement, *id.* at 12, and in its opinion it explained that it then took curative measures:

> In response to the prosecutor's statement about the defendant possibly going "home," this Court offered a curative instruction.
>
> > However, what I need to make clear to you is that this case is going to be decided by you. And you have to concern yourself with the evidence, not with any implication of your verdict. Even if you do find him guilty. So it's of no concern or not an issue that you need to be concerned with in looking at that evidence. Whether he goes home as, as was referred to, he's going to go home every day until you say otherwise. Okay. Proceed.
>
> [T]he prosecutor speculated during his closing argument about how many guns the defendant might possess[:]
> . . .
>
> > [THE COMMONWEALTH]: There is no way for Detective Booker to know it's a .32 revolver. There is only one way to know it because the defendant told him so. He wrote it down. And he said I think so. He wrote it down. Why isn't he sure? Maybe he has 150 guns. He doesn't know which revolver he used.
>
> The trial court again gave a "curative" instruction to the jury and addressed the issue as to whether the jury may have concluded that the number of guns that the defendant owned was an issue that was relevant to their decision about guilt in the instant case[:]

It is not evidence in this case that the defendant owns any other guns or possessed any other guns. So totally disregard that when it comes up. Maybe he has 150 guns. This was closing argument and by the Commonwealth countering the argument that defense put on in reference to a .32 in the statement, a .32, I think was what was in the statement. But just to remind you this defendant is not on trial for any other firearms other than the .32 or a handgun, as I should call it, and not 150 guns. Nor is there any evidence in this case or presented to you that you would be considering to support any argument by anyone that he owns any other guns. It doesn't exist. So disregard it. All right.

Trial Ct. Op., 5/10/07, at 12-13 (citations to notes of testimony omitted)

The trial court recounted the subsequent procedural history as follows:

The jury rendered its verdict as to [Appellant] on August 1, 2005, and adjudged the defendant guilty of all charges. He was found guilty of murder in the first degree, in addition to guilty verdicts for firearms not to be carried without a license and possessing instruments of crime. The sentencing hearing for [Appellant] was deferred, and a pre-sentence investigation report and mental health evaluation were ordered.

After a review of the facts of this case, [Appellant]'s prior record score, and his offense gravity score, [Appellant] was sentenced on September 15, 2005. He was formally sentenced to the mandatory term of life imprisonment for the first-degree murder conviction, a consecutive term of three and one half to seven and one half years' imprisonment for firearms not to be carried without a license, and a concurrent term of two and one half to five years' imprisonment for possessing instruments of crime.

[Appellant]'s direct appeal to the Superior Court of Pennsylvania followed the judgment of sentence, and was timely filed on October 7, 2005. [The trial court] ordered [Appellant] to file a Pa.R.A.P. 1925(b) statement of matters complained of on appeal on February 23, 2006, and the filing deadline for the statement was set for March 8, 2006. [Appellant]'s counsel did not file the 1925(b) statement until March 9, 2007. The Superior Court found "Appellant's issue to be waived on appeal", and affirmed the judgment of sentence on October 24, 2007. [Appellant]

appealed this decision to the Supreme Court of Pennsylvania, but the Petition for Allowance of Appeal was denied on May 14, 2008.

On August 10, 2008, [Appellant] filed a pro se PCRA[4] petition in an attempt to regain his direct appeal rights. PCRA counsel was appointed for him, and an amended petition was filed thereafter. On July 15, 2010, [Appellant]'s appeal rights were reinstated *nunc pro tunc*. A second notice of appeal to the Superior Court of Pennsylvania was filed with this Court on August 16, 2010.

Trial Ct. Op., 5/10/07, at 1-3. In our decision on Appellant's appeal, we recounted:

On September 10, 2010, the trial court directed appellant to file a concise statement of errors complained of on appeal within 21 days pursuant to Rule 1925(b). On October 1, 2010, counsel filed a "PRELIMINARY 1925(B) STATEMENT AND PETITION FOR EXTENSION OF TIME TO FILE 1925(B) STATEMENT." In this statement, [A]ppellant raised the following boilerplate issues:

     a. Sufficiency of the evidence[;]

     b. The verdict was against the weight of the evidence;

     c. Trial Court Error; and

     d. Prosecutorial Misconduct.

The certified record does not indicate that the trial court granted appellant an extension. However, on December 3, 2010, [A]ppellant filed an additional Rule 1925(b) statement raising the following issues: whether the trial court erred in denying his motion to suppress; whether the trial court erred in denying trial counsel's motion for a mistrial regarding remarks made during closing argument; and, whether the trial court's curative instruction relating to the prosecutor's comments was flawed. The trial court filed a Rule 1925(a) opinion on January 19, 2011.

---

[4] Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546.

*Commonwealth v. Burton*, No. 2363 EDA 2010, at 2-3 (Pa. Super. Oct. 31, 2012) (unpublished memorandum) (footnotes omitted) (citations to the record omitted).

On October 31, 2012, this Court held:

We find the two claims presented in [A]ppellant's brief concerning prosecutorial misconduct during closing argument are waived. Appellant failed to include these two specific issues in his initial Rule 1925(b) statement. Instead, he included the issues only in an untimely supplemental statement, filed without permission from the trial court. This was inadequate to preserve the claims. A trial court's order to file a Rule 1925(b) statement within 21 days does not permit a defendant to file additional statements whenever he thinks up new issues. *Commonwealth v. Jackson*, 900 A.2d 936, 939 (Pa.Super. 2006) (issues raised in untimely supplemental Rule 1925(b) statement filed without leave of court are waived). Instead, a defendant who, for good cause shown, discovers that additional time is required to supplement a Rule 1925(b) statement must file a separate petition seeking permission to supplement and obtain an order granting that request; otherwise, any issues raised in an untimely supplemental statement will not be preserved for appellate review. *Commonwealth v. Woods*, 909 A.2d 372, 378 (Pa. Super. 2006), *appeal denied*, 591 Pa. 714, 919 A.2d 957 (2007).

Nor can we find that [A]ppellant's request for an extension of time to file a Rule 1925(b) statement detailed good cause; counsel merely averred that she needed more time to review the record and to communicate with [A]ppellant. Such will not suffice to reserve additional time. The record demonstrates that the transcripts were available. In fact, the issue of prosecutorial misconduct had been presented in the original Rule 1925(b) statement for purposes of direct appeal and was addressed by the trial court in its original Rule 1925(a) opinion which current counsel attached to her amended PCRA petition.

Finding that [A]ppellant failed to follow the proper procedure and failed to obtain court approval, we find that the claims raised in the supplemental statement are waived.

**Burton**, No. 2363 EDA 2010, at 3-4 (footnote omitted) (citations to the record omitted). However, we also concluded that the sentence imposed for carrying a firearm without a license was illegal, and an illegal sentence can never be waived. **Id.** at 5-6. We therefore vacated the illegal sentence, amended the sentence for carrying a firearm without a license to conform to the trial court's intent to sentence Appellant to the mandatory minimum, and affirmed the judgment of sentence in all other respects.

On June 10, 2013, Appellant filed a new PCRA petition. On October 2, 2015, he filed an amended petition. On December 8, 2015, in agreement with the Commonwealth, the trial court reinstated Appellant's direct appeal rights *nunc pro tunc*. On December 9, 2015, Appellant filed a timely notice of appeal.

Appellant now raises the following issues on appeal:

A. Did the [trial] court err in denying the motion to suppress?

B. Was Appellant denied a fair trial due to prosecutorial misconduct in his closing argument and did the [trial] court err in not granting a motion for a mistrial?

Appellant's Brief at 6.

## Suppression

Appellant first contends that the trial court "erred in not granting the motion to suppress Appellant's statement." Appellant's Brief at 21.

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record

and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress.

*Commonwealth v. Freeman*, 150 A.3d 32, 34–35 (Pa. Super. 2016) (citation omitted), *appeal denied*, No. 853 MAL 2016, 2017 WL 2081215 (Pa. May 15, 2017).

Appellant declares that his "lengthy period of detention together with his extremely apprehensive state made him a perfect candidate to have his will overborne" when he gave his inculpatory statement on August 31, 2004. Appellant's Brief at 18, 23. Appellant contends that "once [he] arrived at the homicide unit he was not free to go." *Id.* at 23. He thus concludes that, "[b]ased on a totality of the circumstances, it is apparent that Appellant's statement was not voluntarily given and therefore the court below erred in not granting the motion to suppress." *Id.* at 24; *see also id.* at 22 ("The voluntariness of a statement is to be determined by a totality of the circumstances" (citing *Commonwealth v. Nestor*, 709 A.2d 879 (Pa.

1998); *Commonwealth v. DiStefano*, 782 A.2d 574 (Pa. Super. 2001),

*appeal denied*, 806 A.2d 858 (Pa. 2002)).

The trial court explains that it denied Appellant's motion to suppress,

because:

> There is simply no doubt about the propriety of the trial court's findings of facts and conclusions of law since there was no evidence of any kind that the statement was coerced, that the defendant was subjected to interrogation without counsel, or that "he was either not fully given his *Miranda* warnings or did not understand his warnings."

Trial Ct. Op., 5/10/07, at 9 (quoting N.T., 7/25/05, at 3).

The factors to be considered when evaluating the voluntariness of a

confession include:

> the accused's age; his level of education and intelligence; the extent of his previous experience with police; the repeated and prolonged nature of the questioning; the length of detention prior to the confession; whether he was advised of his constitutional rights; whether he was injured, ill, drugged, or intoxicated when he confessed; whether he was deprived of food, sleep, or medical attention; and whether he was physically abused or threatened with abuse.

*Commonwealth v. Perez*, 845 A.2d 779, 785 (Pa. 2004). Here,

Appellant's questioning was neither repeated nor prolonged. Detective

Booker questioned Appellant for approximately 20 minutes – between the

detective's arrival at the homicide division at 4:00 A.M. until he left to

corroborate Appellant's information at 4:20 A.M. Trial Ct. Op., 5/10/07, at

6. Other delay was due to Appellant having to wait for the detective to

arrive at or to return to the homicide division; Appellant was not being questioned during this time. *Id.*

Additionally, there was no "length of detention prior to the confession." *Perez*, 845 A.2d at 785. Appellant argues that "once [he] arrived at the homicide unit he was not free to go," Appellant's Brief at 23, but he offers no evidence to support that argument. *See id.* He does not state that, at the time of his statement, he subjectively believed that he was not free to leave. *See id.* Appellant had contacted the police about making a statement, not *vice versa*, and his family members were present with him or available by telephone during the entire time he was at the homicide division before he gave his final statement. Furthermore, Appellant "was advised of his constitutional rights" before giving his statement. Trial Ct. Op., 5/10/07, at 6.

Thus, as Appellant's questioning was neither repeated nor prolonged, he was not detained prior to his confession, he was advised of his constitutional rights, and he was not injured, ill, drugged, intoxicated, hungry, sleep-deprived, in need of medical attention, physically abused, nor threatened with abuse, we conclude that the trial court correctly found that Appellant's confession was voluntary. *See Perez*, 845 A.2d at 785. Hence, we hold that the trial court correctly denied Appellant's suppression motion, and, therefore, that Appellant's first issue raised on appeal is meritless.

## Prosecutorial Misconduct

Next, Appellant argues that the trial court "erred in denying trial counsel's motion for mistrial and Appellant was denied a fair trial by the misconduct of the prosecutor in his closing." Appellant's Brief at 24 (unnecessary capitalization omitted). Appellant points out —

> Pennsylvania courts have held that a new trial is warranted where the prosecutor expresses his or her personal belief either by direct statement or indirect figure of speech either as to the guilt or innocence of the defendant or the veracity of the witnesses and where the prosecutor engages in conduct designed to arouse or inflame the passions of the jury to act out of sympathy for the victim.

*Id.* at 19, 23 (citing *Commonwealth v. Bricker*, 487 A.2d 346 (Pa. 1985) (plurality); *Commonwealth v. Van Cliff*, 397 A.2d 1173 (Pa.), *cert. denied*, 441 U.S. 964 (1979); *Commonwealth v. Raffensberger*, 435 A.2d 864 (Pa. Super. 1981); *Commonwealth v. Pfaff*, 335 A.2d 751 (Pa. Super. 1975), *judgment rev'd*, 384 A.2d 1179 (Pa. 1978)).

Analysis of Appellant's argument requires that the prosecutor's remarks be viewed in context. As we recently stated, "in order to evaluate whether the comments were improper, we do not look at the comments in a vacuum; rather we must look at them in the context in which they were made." *Commonwealth v. Proctor*, 156 A.3d 261, 271-72 (Pa. Super. 2017). Our Supreme Court has observed that a "prosecutor's closing remarks" may be "a fair response to defense counsel's closing argument." *Commonwealth v. Carson*, 913 A.2d 220, 239 (Pa. 2006), *cert. denied*,

552 U.S. 954 (2007). Only a review of the closing arguments as a whole can enable an assessment of the propriety of a prosecutor's closing to determine whether they were a fair response or an improper effort to inflame.

Unfortunately, we are unable to make that assessment here. The notes of testimony do not appear in the certified record. Indeed, we lack not just the notes for the closing arguments on July 29, 2005, but those for the entire jury trial.[5] Counsel failed to provide us with these critical materials by including them in the record, and our own efforts to locate the notes of testimony have been unsuccessful.[6] We therefore are unable to provide relief on this issue.

In **Commonwealth v. Bongiorno**, 905 A.2d 998 (Pa. Super. 2006) (*en banc*), **appeal denied**, 917 A.2d 844 (Pa. 2007), we explained:

> Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty. **Commonwealth v. Kleinicke**, 895 A.2d 562, 575 (Pa.Super.2006) (*en banc*). In **Commonwealth v. Preston**, 2006 PA Super 170, ¶ 7, 904 A.2d 1 (*en banc*), we explained that to facilitate an appellant's ability to comply with this

---

[5] The only notes of testimony in the certified record are for the suppression hearing on July 25 and 26, 2005, and the sentencing hearing on September 15, 2005.

[6] Although, as we discuss in the text, the responsibility to provide us with a complete certified record lies with counsel, we endeavored unsuccessfully to obtain the missing transcripts by contacting the trial court and counsel for both parties.

requirement, our Supreme Court adopted the following procedural rule effective June 1, 2004:

> The clerk of the lower court shall, at the time of the transmittal of the record to the appellate court, mail a copy of the list of record documents to all counsel of record, or if unrepresented by counsel, to the parties at the address they have provided to the clerk. The clerk shall note on the docket the giving of such notice.

Pa.R.A.P. 1931(d).

As the explanatory comment to Rule 1931 indicates, if counsel (or a party) discovers that anything material has been omitted from the certified record, the omission can be corrected pursuant to the provisions of Rule of Appellate Procedure 1926. Under Rule 1926, an appellate court **may** direct that an omission or misstatement shall be corrected through the filing of a supplemental certified record. However, this does not alter the fact that the ultimate responsibility of ensuring that the transmitted record is complete rests squarely upon the appellant and not upon the appellate courts. **Preston**, 2006 PA Super 170, at ¶ 7.

An appellant should not be denied appellate review if the failure to transmit the entire record was caused by an "extraordinary breakdown in the judicial process." **Commonwealth v. Williams**, 552 Pa. 451, 715 A.2d 1101, 1106 (1998). However, if the appellant caused a delay or other problems in transmitting the certified record, then he or she is not entitled to relief and the judgment of the court below should be affirmed. **Id. See Commonwealth v. Barge**, 560 Pa. 179, 743 A.2d 429, 429–30 (1999) (directing that if documents are missing from the certified record because of a default by court personnel, an appellant is entitled to have his claims resolved on the merits, but if the absence of the evidence is attributable to the appellant's failure to comply with the relevant procedural rules, the claims will be deemed to have been waived).

Nevertheless, the existence of Rule 1931(d) does not supplant the legal mandate that places responsibility on the appellant to ensure that a complete record reaches the appellate court. The purpose of Rule 1931(d) is to **assist** appellants by providing notice as to what was transmitted so that remedial

action can be taken if necessary. Rule 1931(d) does not absolve the appellant from the duty to see that this Court receives all documentation necessary to substantively address the claims raised on appeal. We caution the bench and bar that if the clerk of court fails to satisfy the requirements of Rule 1931(d) by providing a list of record documents, it behooves the appellant to investigate the matter. The failure of counsel or of an unrepresented appellant to make inquiry does not constitute an "extraordinary breakdown in the processes of the court." Whether a default with regard to the contents of the certified record warrants a finding of waiver is a question that must be evaluated under the particular facts and circumstances of a specific appeal.

905 A.2d at 1000-01 (emphasis in original); *see also Commonwealth v. Gonzalez*, 109 A.3d 711, 725 (Pa. Super.), *appeal denied*, 125 A.3d 1198 (Pa. 2015).

The trial court's opinion suggests that the remarks about which Appellant complains were indeed made during closing arguments and that the trial court then dealt with them appropriately.[7] In analyzing Appellant's claim regarding the prosecutor's closing, the trial court stated:

It is well settled that a prosecutor is not permitted to express a personal belief regarding the defendant's guilt or innocence or the veracity of the defendant or the credibility of

---

[7] The excerpts from the closing quoted by the trial court suggest that the Commonwealth did not broadly characterize Appellant as a liar, *see Commonwealth v. Judy*, 978 A.2d 1015, 1023-24 (Pa. Super. 2009), and that the Commonwealth's allusions to "sending" Appellant "home," its use of the word "joke" to describe Appellant's defense, and its reference to Appellant hypothetically having a hyperbolic number of handguns were merely permissible oratorical flourishes, presented with force and vigor. *See Commonwealth v. Koehler*, 737 A.2d 225, 240-41 (Pa. 1999), *cert. denied*, 531 U.S. 829 (2000); *Commonwealth v. Chester*, 587 A.2d 1367, 1378 (Pa.), *cert. denied*, 502 U.S. 849 (1991), *and*, 502 U.S. 959 (1991).

his witnesses. However, the appellate courts have also recognized that "not every intemperate or uncalled for remark by the prosecutor requires a new trial." It should be noted that the general rule is that a prosecutor's remarks must be evaluated in the context in which they occurred and that they do not constitute reversible error when they are elicited by the nature of the defense mounted and where the evidence supports the inference that the defendant or his witness has misled the jury.

Finally, the Supreme Court of Pennsylvania has held that an "appellate court must consider whether the prosecutor made a deliberate attempt to destroy the objectivity of the factfinder or merely summarized the evidence presented at trial with the oratorical flair permitted during argument.["] It should be clear in the instant case that the prosecutor's remarks here were directed at relevant issues in the case and were within the bounds of appropriate responses to or reasonable interpretations of the evidence presented.

Moreover, even if one were able to conclude that the prosecutor's remarks were improper, the trial court's curative instructions in both instances were requested by the defendant and clearly directed the jury to disregard them while emphasizing the principles that protect a defendant's rights. It has long been held that a strong curative instruction is sufficient to remediate any potential prejudice. Moreover, it has always been the law that juries are presumed to follow the instructions given to them by the trial court. Under these circumstances, there is no reason to believe that the prosecutor's remarks were a factor in the jury's determination of guilt in a case where the incriminating evidence against the defendant was both overwhelming and uncontradicted.

Trial Court Op. at 13-15 (citations omitted).

The trial court's opinion accurately states the law. But without a transcript, we are unable to review the trial court's analysis or conclusions. Under the particular facts and circumstances of this appeal, in which Appellant breached his duty to ensure that the certified record is complete

for purposes of appellate review by including the notes of testimony, we conclude that Appellant's claim is otherwise unreviewable, as the record does not contain all of the materials necessary for us to perform our duty as a reviewing court. **See Gonzalez**, 109 A.3d at 725; **Bongiorno**, 905 A.2d at 1000-01. Appellant therefore is not entitled to relief on this issue.

Because Appellant's first issue is meritless and his second issue is unreviewable, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/26/2017