J-S42014-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
:  PENNSYLVANIA
:
v. :
:
:
:
JERALD LATEITH BROWN :
:
Appellant : No. 1676 MDA 2017

Appeal from the Judgment of Sentence October 19, 2017
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0003336-2015

BEFORE: BOWES, J., McLAUGHLIN, J., and STRASSBURGER*, J.

MEMORANDUM BY BOWES, J.: **FILED FEBRUARY 01, 2019**

Jerald Lateith Brown appeals from the judgment of sentence of seven to fourteen years of incarceration imposed following his non-jury conviction for possession with intent to deliver. We remand with instructions.

In the early morning hours of April 8, 2015, Pennsylvania State Police Troopers Travis Martin and David Long were monitoring traffic along an interstate corridor. At approximately 2:00 a.m., Trooper Martin observed a vehicle slowly travelling in the right lane. The vehicle appeared to be new, with bar codes indicative of a rental vehicle. The officers followed the vehicle, which moved into the left lane without overtaking any vehicles for the next mile or two. The troopers thereafter initiated a traffic stop, and Trooper Martin made contact with the two occupants.

Trooper Martin requested the vehicle's paperwork from Appellant, the driver. Appellant handed over a rental agreement, which did not list his name

_____
* Retired Senior Judge assigned to the Superior Court.

as an authorized driver. Appellant also supplied a Maryland learner's permit, which struck Trooper Martin as odd since Appellant was over thirty years old and "[m]ost people either don't have a license at that age, never get one, or normally it's younger folks that have a learner's permit." N.T. Suppression, 3/29/17, at 18. At that point, Trooper Martin asked Appellant to step outside the vehicle.

Appellant complied, and Trooper Martin asked about his travels. Appellant initially replied that he was coming from Allentown, where his brother-in-law lived. Appellant then changed his story and stated that he was visiting a friend who just had a baby. Appellant said he had arrived in Allentown around 10:00 a.m. the prior day and was returning to Maryland. When asked if he was from Maryland, Appellant stated that he was born and raised there.

Meanwhile, Trooper Long was in his police vehicle typing up a warning and checking the occupants for criminal history and warrants. Trooper Martin reviewed the history, and saw that Appellant was born in New York and had two prior convictions for possession with intent to deliver controlled substances. Trooper Martin decided to speak to the passenger, who had been separated from Appellant during the aforementioned conversation, to see if their stories matched. She told him they had arrived in Allentown around 4:00 p.m. the prior day to visit a friend, and she stayed in the car while Appellant went inside to see the child. Trooper Martin returned to Appellant, who stated that the passenger joined him inside the friend's house for dinner.

At this point, the traffic stop was completed. Trooper Martin asked for consent to search the vehicle, which Appellant declined. The troopers detained Appellant and called Trooper John Mearkle, the on-duty K-9 officer. Trooper Mearkle was at home, and it took twenty-five minutes for him and his dog, Zigi, to arrive.[1] Trooper Mearkle deployed Zigi, who displayed alert behaviors on the passenger side of the vehicle. Zigi jumped inside the vehicle, and provided a further indication at the center console area. Trooper Martin searched the entire vehicle, and from the trunk recovered a large laundry bag full of synthetic marijuana. Testing indicated that the total weight was 5,485.39 grams. Appellant stated that the drugs were his and that the passenger was not involved.

Appellant was arrested and charged with one count of possession with intent to deliver, and one count of possession. Appellant's motion to suppress the evidence was denied, and following a stipulated non-jury trial he was found guilty of both counts and sentenced as indicated. Appellant filed a notice of appeal, and complied with the order to file a concise statement of errors complained of on appeal. The trial court filed its Pa.R.A.P. 1925(a) opinion, and the matter is ready for review of the following claims.

> 1. Whether the Trial Court erred in denying Appellant's Motion to Suppress Evidence where Pennsylvania State Police Troopers stopped and detained Appellant without probable cause in

---

[1] The transcript spells the name as "Ziggy." However, a motion filed by the Pennsylvania State Police lists the name as "Zigi," and we therefore use that spelling throughout.

violation of Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution.

2. Whether the Trial Court erred in denying Appellant's Motion to Suppress Evidence where the police search of Appellant's trunk went beyond the scope of Appellant's alleged consent in violation of Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution.

3. Whether the Trial Court erred in denying Appellant's Motion to Suppress where a canine search was conducted without reasonable suspicion, in violation of Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution.

4. Whether the Trial Court erred in denying Appellant's Motion to Suppress Evidence where Appellant was detained for an unreasonable amount of time without reasonable suspicion or probable cause while waiting for a canine unit to arrive, in violation of Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution.

5. Whether the Trial Court erred in denying Appellant's Motion to Suppress Evidence where the search of Appellant' vehicle occurred without a warrant, without consent, and without probable cause in violation of Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution.

6. Whether the Trial Court erred in denying Appellant's Motion to Suppress Evidence where statements admitting to the ownership of all contraband found in the vehicle were gained following violations of Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution.

7. Whether the Trial Court erred in denying Appellant's subpoenas to Pennsylvania State Police regarding, *inter alia*, records, training, policy, and procedures of Pennsylvania State Police K-9 and specifically K-9 Zigi as there are articulable reasons that such information would lead to the discovery of relevant evidence and denying same was a violation of The Rules of Criminal Procedure and of Appellant's Pennsylvania and United States Constitutions under the Confrontation Clause and the Sixth Amendment.

Appellant's brief at 5-6 (reordered).

The first issue concerns the validity of the seizure, which was based on a violation of the following statute:

**(d) Driving in right lane.—**

(1) Except as provided in paragraph (2) and unless otherwise posted, upon all limited access highways having two or more lanes for traffic moving in the same direction, all vehicles shall be driven in the right-hand lanes when available for traffic except when any of the following conditions exist:

(i) When overtaking and passing another vehicle proceeding in the same direction.

75 Pa.C.S. § 3313(d)(1)(i).

Appellant asserts that the troopers lacked the requisite probable cause to stop him based on the recorded video[2] of Appellant's driving. Trooper Martin agreed on cross-examination that, "in front of [Appellant], a distance ahead, was a big truck, like a tractor-trailer truck." N.T., 3/29/17, at 46. That truck was in the right lane. Appellant, driving in the left lane, moved back to the right lane to let a car pass. However, Appellant did not overtake the truck. *Id*. at 47-48. Trooper Martin stopped Appellant's vehicle after a total distance of one to two miles for staying in the left lane.

---

[2] The video is not part of the electronic certified record. This Court attempted to retrieve a copy through the Prothonotary, but those efforts were unsuccessful. A copy was included with the reproduced record, which we have reviewed.

We find that the seizure was valid. Preliminarily, we note that the requisite level of suspicion needed to effectuate a seizure depends on the type of traffic offense at issue. **See Commonwealth v. Bush**, 166 A.3d 1278, 1282 (Pa.Super. 2017). The Commonwealth agrees that the higher standard of probable cause was needed, and we therefore accept same.

Pursuant to the statute, as quoted *supra*, Appellant was required to drive in the right-hand lane unless any of the conditions listed within (d)(1)(i-iv) existed. Appellant argues that § 3313(d)(1)(i) authorized his presence in the left lane: "Although Appellant's vehicle was traveling in the left lane, it appears on the video that he was attempting to either pass the tractor trailer in front of him or position his vehicle to better see the road due to the inclement weather and effect of driving behind the truck." Appellant's brief at 19. Therefore, he asserts that he was driving in the left lane to place himself in position for the statutorily-permissible act of overtaking the tractor trailer.

We need not decide whether Appellant's driving actually violated the statute as a matter of proof beyond a reasonable doubt, since the applicable standard for probable cause does not require proof of the underlying violation. **See Commonwealth v. Thompson**, 985 A.2d 928, 931 (Pa. 2009) ("The question we ask is not whether the officer's belief was "correct or more likely true than false. Rather, we require only a probability*,* and not a *prima facie* showing, of criminal activity.") (citations omitted). Thus, the fact that the traffic violation may not have been established beyond a reasonable doubt

does not invalidate the seizure. *See Commonwealth v. Bailey*, 947 A.2d 808, 814 (Pa.Super. 2008) (holding officer was justified in stopping driver based upon suspected violation of statute regulating sound levels of motor vehicles "even though [the officer] had neither the training nor the instrumentation to establish beyond a reasonable doubt that the sound emitted by Appellant's vehicle exceeded the prescribed sound levels").

Presently, we find that there was a probability that § 3313(d)(1) was violated, which, in turn, justifies the seizure. We have reviewed the video and Appellant's vehicle does not appear to close the distance between his vehicle and the truck.[3] Thus, the video does not support Appellant's claim that he was attempting to pass the truck. The potential violation was doubtlessly minor, but "Pennsylvania law makes clear that a police officer has probable cause to stop a motor vehicle if the officer observes a traffic code violation, even if it is a minor offense." *Commonwealth v. Harris*, 176 A.3d 1009, 1019 (Pa.Super. 2017).[4]

Appellant's next five claims all concern challenges to the trial court's denial of his suppression motion, which Appellant discusses together.

---

[3] The video does not display the speed of the police cruiser.

[4] *But see Commonwealth v. Enick*, 70 A.3d 843, 848 (Pa.Super. 2013) (not foreclosing possibility that a "momentary and minor violation" of statute requiring driving on right side of roadway would not permit seizure; "We simply wish to emphasize that in considering whether a Vehicle Code violation is momentary and minor, we must give due consideration to the language of the code provision at issue.").

Appellant's brief at 20 ("For ease of discussion, these matters will be argued together."). We likewise discuss them together, albeit reordered for ease of discussion.

"Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." **Commonwealth v. Jones**, 988 A.2d 649, 654 (Pa. 2010) (citation omitted). "Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court[.]" **Id.**

We readily dispose of Appellant's consent claim as presented in his second issue. After Zigi jumped in the car, Trooper Martin informed Appellant of the dog's behavior. Appellant then stated "You can search inside of the car," but did not give permission to search the trunk. N.T. Suppression, 3/29/17, at 65-66. However, the troopers did not request consent at that juncture and the Commonwealth did not rely on Appellant's unsolicited statement as a basis to search the vehicle. The Commonwealth asserted that Zigi's alertive behaviors justified a search of the vehicle, an issue discussed in the text *inra*. Therefore, this argument merits no relief.

We now address issues three through six. A key question regarding these points of error is whether the officers possessed reasonable suspicion to

believe that Appellant was engaged in drug activity. If not, the remaining issues are irrelevant, as there is no doubt that the troopers lacked probable cause to search the vehicle absent Zigi's reactions. As we explained in **Commonwealth v. Green**, 168 A.3d 180 (Pa.Super. 2017), a sniff of a vehicle's exterior is search that must be supported by reasonable suspicion.

> A canine sniff is a search pursuant to Article I, Section 8 of the Pennsylvania Constitution. However, because this type of search is inherently less intrusive upon an individual's privacy than other searches, our Supreme Court has held that police do not need probable cause to conduct a canine search of a place. Rather, the police need merely have reasonable suspicion for believing that narcotics would be found in the place subject to the canine sniff.

**Id**. at 185–86 (cleaned up). The **Green** Court explained that the investigating officer therein had reasonable suspicion for an exterior search for the following reasons:

> We conclude that Trooper Conrad possessed reasonable suspicion to detain Green on suspicion that he was trafficking drugs. When Trooper Conrad approached the vehicle and made contact with Green, he immediately noticed that Green was "overly nervous just for being stopped for a traffic violation," as Green's carotid artery was pulsating and "his lips and face area around his lips were trembling." Upon reviewing the vehicle's documentation, Trooper Conrad discovered that the vehicle belonged to an absent third party, which, in his experience, raised his suspicion that the vehicle was being used for drug trafficking. In addition, Green stated that he was returning from Philadelphia, a city known to Trooper Conrad as a source location for narcotics. Trooper Conrad also performed a criminal background check on Green, which showed "a lengthy criminal history for ... assault and drug offenses." Further, when Trooper Conrad stopped the vehicle, he remembered prior contacts with Green and with the subject vehicle. Trooper Conrad's prior contact with Green, where Green was a passenger in a vehicle stopped by Trooper Conrad, resulted in recovery of cocaine and marijuana hidden in the engine compartment of the vehicle. Trooper Conrad's prior contact with

the tan Dodge sedan resulted in recovery of a hypodermic needle in the passenger compartment. Under these circumstances, we agree with the trial court that Trooper Conrad possessed reasonable suspicion that Green was trafficking drugs.

*Green*, *supra* at 184–85 (citations omitted).

While Appellant did not display nervousness, in most other respects this case aligns with *Green*. Appellant was driving a newer rental vehicle, and the rental agreement was in the name of a third party.[5] Additionally, as in *Green*, Trooper Martin testified that Allentown is a source city, and he explained that its proximity to New York City made Allentown a popular location to deliver drugs and money. Trooper Martin stated that the particular corridor he was monitoring "is a very common area to bring criminal activity." N.T. Suppression, 3/29/17, at 27. Furthermore, Appellant had two previous convictions for possession with intent to deliver, and was driving home in the early morning hours. Moreover, Appellant's explanation for his short one-day trip to Allentown diverged in significant respects with the account of his passenger.

Trooper Martin agreed that many of these facts in isolation are not indicative of criminal activity, but it was the combination of all the facts that

---

[5] Trooper Martin stated that Appellant "was authorized" to drive the vehicle. N.T. Suppression, 3/29/17, at 17. The testimony also established that the rental agreement was issued to a third party who was not in the vehicle. *Id*. It appears that Appellant represented that he was permitted to drive the vehicle by virtue of the missing third party's consent, which Trooper Martin apparently accepted. *Id*. ("Q. He indicated to you he was authorized to drive it? A. Yes.").

- 10 -

gave rise to his belief that Appellant's car contained narcotics. Taken together, we find that Trooper Martin articulated sufficient facts to find a reasonable suspicion that Appellant was engaged in narcotics activity. As stated in **Commonwealth v. Cook**, 735 A.2d 673, 676 (Pa. 1999):

> Even a combination of innocent facts, when taken together, may warrant further investigation by the police officer. **Id**. Moreover, "in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences he is entitled to draw from the facts in light of his experience." **Id**. at 27.

**Id**. at 676 (cleaned up).

Having found that the officers possessed reasonable suspicion of drug activity, we now address Appellant's argument that the length of the stop was constitutionally unreasonable as raised in his fourth issue. This argument addresses two distinct timeframes. The first is the length of the stop preceding the request for the K-9 unit, which was approximately twenty-three minutes. The second portion addresses the entire length of the stop, which was fifty-four minutes when including the twenty-five minutes needed for Zigi and his handler to arrive and search the vehicle. For the latter proposition, Appellant cites case law discussing the notion that a seizure supported by reasonable suspicion can be so lengthy as to become a *de facto* arrest, which must be supported by probable cause.

We begin with Appellant's claim that the twenty-three-minute detention preceding the request for the K-9 unit was unreasonably prolonged by the troopers.

> Rather than issuing a traffic citation or issuing a warning, Trooper Martin focused his encounter with Appellant on a non-essential fishing expedition in an attempt to discover some illegality. After being informed of the alleged traffic infraction, Appellant produced the necessary paperwork to Trooper Martin. Rather than accepting this information, Trooper Martin focused his attention on the fact that Appellant was driving a rental vehicle. It was clear Appellant was an authorized user; however, rather than writing a citation or warning, Trooper Martin began asking questions because he wished to search Appellant's vehicle.

Appellant's brief at 27.

Appellant largely relies upon **United States v. Rodriguez**, 135 S.Ct. 1609 (2015), in support. Therein, the High Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." **Id**. at 1612. Thus, an officer cannot "prolong the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." **Id**. at 1615. In **Rodriguez**, Officer Morgan Struble stopped a vehicle for veering onto the shoulder of a highway for one to two seconds. Two men, Dennys Rodriguez and Scott Pollman, were in the vehicle. The officer took Rodriguez's license, registration, and proof of insurance, and then ran a records check. Officer Struble returned to the vehicle and asked Pollman for his driver's license, and questioned him about their travel plans. The officer again returned to his vehicle and performed a similar check on Pollman. On the third approach of

Rodriguez's vehicle, the officer issued the written warning. By that point, approximately twenty-two minutes had elapsed.

Significantly, Officer Struble agreed that at this point in the encounter he had "got all the reasons for the stop out of the way," *id*. at 1613, but did not consider Rodriguez free to leave. Officer Struble requested a backup unit, who arrived seven or eight minutes later. Officer Struble then had his drug dog perform a sniff. The High Court rejected the United States Court of Appeals for the Eighth Circuit's determination that the delay was *de minimis*, and held that "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. at 1614. Therefore, the eight-minute delay was constitutionally unreasonable in the absence of further reasonable suspicion.

The Court's holding was premised on the notion that the tolerable length of the detention is justified by what authorized the seizure, *i.e.*, the traffic violation. However, **Rodriguez** acknowledged that the Fourth Amendment "tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention." *Id*. (citations omitted).

> Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. **See** LaFave, Search and Seizure § 9.3(c), at 516 (A "warrant check makes it possible to determine whether

the apparent traffic violator is wanted for one or more previous traffic offenses.").

*Id*. at 1615 (cleaned up). The Court concluded that a dog sniff lacks "the same close connection to roadway safety as the ordinary inquiries [and] is not fairly characterized as part of the officer's traffic mission." *Id*.

We reject Appellant's claim that Trooper Martin unlawfully prolonged the stop by questioning Appellant about matters unrelated to the traffic stop. Such inquires are permissible, and in *Rodriguez* the key analysis focused on the eight-minute delay **after** the traffic stop's mission was completed.[6] Herein, we find that the questions asked during the stop itself were permissible, and Trooper Martin's suspicion ripened into reasonable suspicion based, in part, on answers to those questions. That Trooper Martin possessed reasonable suspicion of drug activity at some point during the ordinary mission of the traffic stop distinguishes this case from *Rodriguez*. Therefore, the twenty-three-minute detention preceding the request for Zigi was permissible.

We now address the related claim that the entire length of the stop was constitutionally unreasonable.

> The continued detention of Appellant was unreasonably prolonged. As Justice Marshall warned in [*United States v. Sharpe*, 470 U.S. 675 (1985)], the length of Appellant's stop was unreasonably long in and of itself. Appellant's stop, from pull over to arrest, was approximately one (1) hour. Over twenty-five (25)

---

[6] The *Rodriguez* Court remanded for a determination as to "whether reasonable suspicion of criminal activity justified detaining Rodriguez beyond completion of the traffic infraction investigation[.]" *Id*. at 1616-17.

- 14 -

minutes had elapsed from the time Trooper Martin requested a canine until K-9 Zigi arrived. Unlike **Sharpe,** in the time from the canine's request until his arrival, nothing was done regarding investigation or action on behalf of the Troopers. Rather, Appellant was forced to wait on the side of the road. Such a lengthy delay was unreasonable given the Troopers['] inaction.

Appellant's brief at 29.

In **Commonwealth v. Freeman**, 150 A.3d 32 (Pa.Super. 2016), we addressed a similar argument. Therein, a trooper stopped a vehicle at 11:26 a.m., and issued a written warning at 11:52 a.m. However, the trooper believed that the driver was transporting drugs and requested a K-9 unit after issuing the warning. Approximately "an hour, hour and fifteen minutes elapsed" from the beginning of the stop to the dog search and arrest. **Id**. at 39. We addressed the claim that the entire length of the stop was constitutionally unreasonable as follows:

The United States Supreme Court has explained:

In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. **See Michigan v. Summers**, [452 U.S. 692, 701 n.14, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)] (quoting 3 W. LaFave, Search and Seizure § 9.2, p. 40 (1978)); **see also** [**U.S. v. Place**, 462 U.S. 696, 709, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)]; [**Florida v. Royer**, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)]. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. .... A creative judge

engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable." ***Cady v. Dombrowski***, 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973); see also ***United States v. Martinez–Fuerte***, 428 U.S. 543, 557, n. 12, 96 S.Ct. 3074, 3082, n. 12, 49 L.Ed.2d 1116 (1976). The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

***United States v. Sharpe***, 470 U.S. 675, 686–687, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

. . . [T]he record before us shows that, under the circumstances, the troopers acted reasonably and diligently in pursuing their suspicions during the one-hour-plus time frame. The vehicle was stopped in a rural area of the Commonwealth. In the first half hour after the stop, Trooper Gerken had Appellant move his car to a safer location and then questioned Appellant and notified him of the traffic violation. Trooper Gerken then called for backup and a canine unit. Once the dog arrived, the search was conducted quickly. There is no evidence that the detention was delayed for any improper reason. It stands to reason that dispatching a canine unit to a rural location will likely take longer than doing so in an urban area. We therefore hold that the duration of the detention was not unreasonable.

***Id***. at 43–44.

***Freeman*** is similar to this case, as the length of the initial stop is virtually identical and the overall length of the stop was longer in ***Freeman***.[7]

_____

[7] Appellant notes that ***Freeman*** stated that the presence of reasonable suspicion "may appear to be a close case," and points out that, unlike ***Freeman***, this case did not involve air fresheners. Appellant maintains that

The relevant inquiry is whether the troopers "acted reasonably and diligently" in pursuing their suspicions, and Appellant's only argument in this regard is that the authorities failed to take further action during the time it took to bring Zigi onsite. However, the same was true in **Freeman**, and it is unclear what the troopers could do to further their investigation without a drug-sniffing dog.[8]

Appellant's sixth claim is that the trial court erroneously failed to suppress the evidence "where statements admitting to the ownership" of the items were obtained in violation of the Fourth Amendment and/or Article I, Section 8. Appellant's argument is confusing, as the Commonwealth did not obtain the evidence as a result of his statement. This claim warrants no relief.

_____

this case is an even closer call as a result. As discussed *supra*, the reasonable suspicion test involves the totality of the circumstances and we rely on that analysis.

[8] Appellant does not claim that the authorities were constitutionally required to have a drug-sniffing dog more readily available. In **Sharpe**, Justice Marshall's concurring opinion alluded to this type of analysis:

> [I]f the police know they must structure their **Terry** encounters so as to confirm or dispel the officer's reasonable suspicion in a brief time, police practices will adapt to minimize the intrusions worked by these encounters. Cf. **United States v. Place**, [462 U.S. 696 (1983)](to assure brevity of **Terry** airport stops, narcotic detection dogs must, under some circumstances, be kept in same airport to which suspect is arriving)

**United States v. Sharpe**, 470 U.S. 675, 693 (1985) (Marshall, J., concurring). **See also** 4 Wayne R. LaFave, Search and Seizure § 9.2(f) (5th ed. 2012) (discussing time limits of seizures).

Appellant's final argument attacks the scope of the search in two ways. First, Appellant states that even if there was reasonable suspicion to perform a dog sniff, such search was limited to the vehicle's exterior, meaning that Zigi's jump into the vehicle was not permitted. Second, Appellant claims that any search was limited to the area where Zigi alerted; in this case, the console area.

Appellant's argument fails to appreciate the significance of Zigi's alert. Trooper Mearkle testified, "once we approached the passenger side of the vehicle Zigi displayed alert behaviors." That alert permitted an interior search. *See Commonwealth v. Rogers*, 849 A.2d 1185, 1192 (Pa. 2004) (probable cause to search interior of vehicle based on dog alerting to driver's side of car). With respect to his claim that the scope of the search was limited to the console since Zigi did not alert on the trunk, we disagree.[9] In *United States v. Ross*, 456 U.S. 798 (1982), the High Court opined:

> A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. A warrant to open

---

[9] Appellant emphasizes that Trooper Mearkle agreed that Zigi could not detect synthetic marijuana. N.T. Suppression, 3/29/17, at 87. Appellant ignores the possibility that Zigi detected something else in the console, such as residue, which the troopers simply could not find. In any event, the fact that Zigi may have been wrong about the console does not invalidate the search, as the relevant inquiry regarding the reasonableness of the search is *ex ante*, not *ex post*.

- 18 -

a footlocker to search for marihuana would also authorize the opening of packages found inside. A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search. When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.

*Id*. at 820–21 (footnotes omitted).

Our research indicates that courts follow *Ross* to hold that a canine alert on one part of the vehicle supplies probable cause to search the entire vehicle. *See e.g. United States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004) (canine alert toward passenger area provided probable cause to search trunk; "A dog alert . . . does not implicate the precision of a surgeon working with scalpel in hand"); *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007) (probable cause to search entire vehicle did not dissipate despite fact that initial roadside search did not uncover drugs following dog alert); *United States v. Seals*, 987 F.2d 1102, 1107 (5th Cir. 1993) (discovery of pipe with drug residue after drug dog alerted on area in between front seats justified further search; "Since they did not know exactly where in the car the drugs were located, the officers had probable cause to search the entire vehicle."). Appellant has supplied no argument as to why we should depart from this analysis of *Ross*, and we therefore find that the trunk search was permissible. *See Commonwealth v. Gary*, 91 A.3d 102 (Pa. 2014)

(holding that the law governing warrantless searches of vehicles under Article I, Section 8 is coextensive with federal precedent).

Appellant's remaining issue concerns the trial court's ruling at a March 2, 2017 hearing granting in part a motion to quash filed by the Pennsylvania State Police ("PSP") in response to a subpoena served by Appellant. We begin our consideration by noting our standard of review. "Typically, the standard of review regarding a motion to quash a subpoena is whether the trial court abused its discretion. However, where the issue raised is purely a question of law, this Court's standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. McClure**, 172 A.3d 668, 683 (Pa.Super. 2017) (cleaned up).

The PSP's motion to quash stated that Appellant requested the following items:

a. All written policies and procedures pertaining to officer requests for K-9 assistance;

b. All handbooks, handouts, charts, etc., pertaining to officer requests for K-9 assistance;

c. All written polic[ies], procedures, guidelines and records for training of K-9 units;

d. All written policies and procedures regarding methods of indication of K-9 units regarding suspected contraband;

e. Records of canine Zigi from October 1, 2014, through April 30, 2015; and

f. Copies of all records pertaining to traffic stops conducted by Trooper Travis Martin between October 1, 2014 and April 30, 2015.

Motion to Quash Subpoenas, 1/25/17, at 3-4.

The PSP asserted, *inter alia*, that the requested material was covered by the Criminal History Record Information Act, and, in any event, the request was overbroad, unduly burdensome, and oppressive. Appellant filed a reply as ordered by the court, and the trial court thereafter held a hearing. Attorney Andrew Rongaus, Deputy Chief Counsel of the PSP, appeared on its behalf. At the hearing, the parties came to an agreement as to records of Trooper Martin's traffic stops (Form A and Form B), but disagreed as to the requests involving Zigi. We quote the relevant exchange:

> ATTORNEY WHITE: And, Your Honor, with moving to the information with the K9.
>
> THE COURT: I'm giving Zigi the right to privacy.
>
> ATTORNEY WHITE: Your Honor, I want to be clear too that the information I'm requesting, again, would be mirror [*sic*] that of the trooper.
>
> THE COURT : It's not a suppression issue. It has nothing to do -- has nothing to do with a suppression issue, maybe a trial issue. We'll visit that later.
>
> ATTORNEY WHITE: Your Honor, if I may, I believe that it would be a suppression issue as far as the reliance that basically the officers have contacted this K9 to come to this scene to give them an indication of whether or not that this K9, K9 Zigi, has actually affirmed an indication of contraband. I have the right to, in essence, to confront this witness in evidence.
>
> THE COURT: Not at the suppression. Maybe you do at trial. Let's see where we get on suppression. I'm denying all other requests. The only one I'm approving is this stop contact report Form A and Form B for a three-month period.

ATTORNEY WHITE: Your Honor, does that also then apply to the handbooks and policies that we're requesting K9 --

THE COURT: I'm denying all that. I don't think that's -- I think you're -- would take a stretch for you to somehow show me that's relevant. No. I'm denying it. The only thing I'm approving is the stop contact report Form A and Form B with the redaction that you have agreed to based on Mr. Rongaus's request.

N.T. Motion to Quash, 3/2/17, at 11-12.

In its opinion, the trial court reiterates its belief that Appellant's requests vis-à-vis Zigi were not relevant or supported by "a specific, articulable basis[.]" Trial Court Opinion, 12/26/17, at 10. Based upon our review of the record and the United States Supreme Court's decision in *Florida v. Harris*, 568 U.S. 237 (2013), we disagree.

First, we clarify that the stop contact report forms A and B that were produced by the PSP upon agreement were completed by Trooper Martin, who along with his partner, initiated the traffic stop, and not by Trooper Mearkle, Zigi's handler. Form A details each traffic stop made by Trooper Martin, including the reason for the stop, whether a K9 was utilized, and whether any search or seizure resulted from the stop. Form A indicates that Form B must be utilized in stops involving a non-commercial vehicle, if, *inter alia*, a K9 is used during the stop or the vehicle is searched.

Form B provides information about the basis for Trooper Martin's reasonable suspicion or belief that he had probable cause, as well as whether a K9 was used, whether the K9 alerted, and whether a search and/or seizure took place. Although some of Trooper Martin's Form B reports from the three-

month period at issue reference Trooper Mearkle as the K9 handler involved in particular stops, others indicate that a different K9 unit, or no K9 unit, was utilized.

By allowing the production of Trooper Martin's Form A and Form B reports, with redaction of the personal information of the individuals involved in the stop, the trial court implicitly recognized the relevance of the information contained therein for purposes of the suppression motion. That relevance is borne out by Appellant's use of the documents at the suppression hearing. Appellant, who is black, attempted to cast doubt upon Trooper Martin's credibility in justifying the stop and subsequent investigative detention by highlighting during cross-examination that fifty-five of the eighty-five stops referenced in the Form A reports were of persons racially-identified as other than white; that fifty-eight of the vehicles stopped were of out-of-state vehicles; that only ten of the stops resulted in searches, most of them consensual; and that only three of the ten searches resulted in seizures. N.T. Suppression Hearing, 3/29/17, at 59-62.

As quoted above, Appellant through his subpoena sought the same type of information regarding Trooper Mearkle and Zigi. Appellant specifically articulated the basis for his request: to challenge whether Zigi "actually affirmed an indication of contraband," and whether the troopers reasonably relied upon Zigi's alert to justify the search. N.T. Motion to Quash, 3/2/17, at

12. Under the ***Harris*** decision, Appellant was entitled to some of the materials he subpoenaed for the bases he articulated.

The ***Harris*** Court considered "how a court should determine if the 'alert' of a drug-detection dog during a traffic stop provides probable cause to search a vehicle." ***Harris***, ***supra*** at 240. In that case, the defendant was driving with an expired plate and was "visibly nervous" during the resultant traffic stop. When Harris refused to consent to a search of the vehicle, the officer retrieved a K9 who "alerted at the driver's-side door handle—signaling, through a distinctive set of behaviors, that he smelled drugs there." ***Id***. In a subsequent search based upon the K9 alert, the officers did not find any drugs that the dog was trained to detect, but found substantial quantities of the ingredients for manufacturing methamphetamine. ***Id***. at 240-41. Harris was later stopped again by the same officers while he was out on bail, the same K9 again alerted, but the resulting search this time revealed no contraband. ***Id***. at 241.

Harris moved to suppress the evidence seized in the first search, contending that the dog's alert had not given the officer probable cause to justify the search. At a hearing on the motion, the dog's handler testified about the certifications and training he and the dog had undertaken separately and together, and the prosecution introduced written training logs consistent with the officer's testimony. ***Id***. at 241-42. On cross-examination, Harris focused upon the dog's performance in the field and the fact that his

certification had expired the year before the stop,[10] but did not contest the quality of the training of the dog or his handler. *Id*. at 242.

The trial court concluded that the search was based upon probable cause and denied Harris's suppression motion. Harris appealed the denial following his conviction, and the intermediate appellate court affirmed. The Florida Supreme Court reversed, holding that the mere showing that the dog was trained and certified was not sufficient to create probable cause. Rather, it held that, to satisfy the Fourth Amendment, the state had the burden to establish the dog's reliability by producing evidence of the dog's training and performance history such as "the dog's training and certification records, an explanation of the meaning of the particular training and certification, field performance records (including any unverified alerts), and evidence concerning the experience and training of the officer handling the dog[.]" *Id*. at 242-43.

The United States Supreme Court rejected the notion that the prosecution was required to establish a dog's reliability according to a "strict evidentiary checklist, whose every item the State must tick off." *Id*. at 244 (footnote omitted). Instead, the probable-cause determination in such cases is the same as in any other: whether under the totality of the circumstances, a reasonable person would conclude that there is a fair probability that

---

[10] Certification was not required under Florida law. ***Florida v. Harris***, 568 U.S. 237, 242 (2013).

evidence of crime was present. *Id*. at 243-44. The Court offered the following

critique of the lower court's decision:

> Most prominently, an alert cannot establish probable cause under the Florida court's decision unless the State introduces comprehensive documentation of the dog's prior "hits" and "misses" in the field. (One wonders how the court would apply its test to a rookie dog.) No matter how much other proof the State offers of the dog's reliability, the absent field performance records will preclude a finding of probable cause. That is the antithesis of a totality-of-the-circumstances analysis . . . . So too here, a finding of a drug-detection dog's reliability cannot depend on the State's satisfaction of multiple, independent evidentiary requirements. No more for dogs than for human informants is such an inflexible checklist the way to prove reliability, and thus establish probable cause.

*Id*. at 244–45. The Court also rejected the notion that the K9's record in the

field was more important than its performance in certification or training

programs:

> Making matters worse, the decision below treats records of a dog's field performance as the gold standard in evidence, when in most cases they have relatively limited import. Errors may abound in such records. If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search. Field data thus may not capture a dog's false negatives. Conversely (and more relevant here), if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings. There, the designers of an assessment know where drugs are hidden and where they are not—and so where a dog should alert and where he should not. The better measure of a dog's reliability thus comes away from the field, in controlled testing environments.

*Id*. at 245-46 (footnotes omitted).

As such, the Court concluded that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id*. at 246. The Court recognized, however, that the defendant had a right to dispute the prosecution's proof:

> A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses. The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty. So too, the defendant may examine how the dog (or handler) performed in the assessments made in those settings. Indeed, evidence of the dog's (or handler's) history in the field, although susceptible to the kind of misinterpretation we have discussed, may sometimes be relevant, as the Solicitor General acknowledged at oral argument. And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions.

*Id*. at 247 (citation omitted).

In *Harris*, the prosecution "introduced substantial evidence of [the dog's] training and proficiency in finding drugs[,]" including the testimony of the dog's handler that the dog performed well in training exercises, "and written records confirmed, that in those settings [the dog] always performed at the highest level." *Id*. at 248. Harris did not challenge the dog's training at the suppression hearing, but instead focused upon his field performance, arguing that the two alerts resulting in finding zero drugs that he was trained to detect showed he was unreliable. Concluding that this was insufficient to

rebut the prosecution's evidence because Harris's admitted regular use of methamphetamine readily explained why the dog alerted, the Court concluded that the officer had probable cause to conduct the search. *Id*. at 249-50.

In the instant case, the trial court denied Appellant access to the very tools contemplated by the *Harris* Court to conduct an attack upon Zigi's reliability: information about Zigi's training and his performance in the field. Therefore, we conclude that the trial court erred in quashing Appellant's subpoena in its entirety as to Zigi's reliability. However, Appellant also requested material beyond that contemplated by *Harris*, such as handbooks and policies regarding K9 deployment in general. Moreover, because the PSP has not participated in this appeal, we do not have the benefit of its advocacy as to the scope of the *Harris* decision in relation to the documents in its possession, such as whether this is an instance in which Zigi's field performance is relevant.[11] *See id*. at 247.

Accordingly, we decline to award Appellant relief beyond a remand for a new hearing on the PSP's motion to quash limited to the issue of documents implicating Zigi's reliability. After the trial court determines which documents are due to Appellant under *Harris*, and they are provided and the parties have had an opportunity to review them, it shall conduct a new suppression hearing

---

[11] For example, it is unclear whether it is the PSP's position that any of the documents within the scope of *Harris* are undiscoverable under the Criminal History Record Information Act. If so, the issue may be decided by the trial court upon remand.

limited to the issue of whether the troopers had probable cause to conduct the search following Zigi's alert. "If the suppression court determines the challenged evidence is to be suppressed, then a new trial is granted. If, however, the court determines the evidence is not to be suppressed, the judgment of sentence remains and [A]ppellant may file a timely appeal from that determination, if he so desires." ***Commonwealth v. Hall***, 302 A.2d 342, 346 (Pa. 1973).

Case remanded with instructions. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 02/01/2019